**Lynn MARTIN, Secretary of Labor, United States Department of Labor, Plaintiff, Appellant,**

v.

**TANGO'S RESTAURANT, INC., et al., Defendants, Appellees.**

**No. 91–2213.**

United States Court of Appeals, First Circuit.

Heard June 4, 1992.

Decided July 20, 1992.

Lauriston H. Long, Atty., U.S. Dept. of Labor, with whom Marshall J. Breger, Sol. of Labor, Patricia M. Rodenhausen, Regional Sol., Monica Gallagher, Associate Sol., and William J. Stone, Counsel for Appellate Litigation, U.S. Dept. of Labor, were on brief for appellant.

Wallace Vazquez Sanabria for appellees.

Before CYR, Circuit Judge, RONEY,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

* Of the Eleventh Circuit, sitting by designation.

BOUDIN, Circuit Judge.

The Secretary of Labor brought suit under the Fair Labor Standards Act of 1938 ("FLSA" or "the Act"), 29 U.S.C. § 201 *et seq.*, against a corporation and its owners ("the defendants") to enjoin and redress violations of the statute. After a trial, the district court awarded some but not all of the relief sought by the Secretary. The Secretary seeks review on two issues. On one of them, we agree with the Secretary and reverse the district court; and on the other, we remand for further proceedings.

## I. BACKGROUND

Tango's Restaurant, Inc. ("Tango's"), is a corporation conducting a restaurant business in Hato Rey, Puerto Rico. Its president is Jorge Carcavallo, who manages the business together with his wife, Vilma Carcavallo, the restaurant's secretary, treasurer and office manager. Together, they own the business. The Secretary, who is responsible for enforcing the FLSA, conducted an investigation of Tango's and concluded that Tango's was keeping inaccurate records and failing to pay minimum wages and required overtime compensation. On June 11, 1991, the Secretary brought suit in the district court, naming the corporation and both Carcavallos as defendants. Although the complaint charged a number of violations, only two episodes are pertinent to this appeal, and the facts set forth below are limited to those episodes.

In the district court, the Secretary sought back pay and liquidated damages for the waiters at Tango's, asserting that they had not been paid the minimum wage (FLSA § 6, 29 U.S.C. § 206) or required overtime compensation. FLSA § 7, 29 U.S.C. § 207. After extensive discovery, a six-day trial was held before the district judge. On July 31, 1991, the district court entered judgment, together with findings of fact and conclusions of law, granting extensive relief against defendants but not all of the relief sought by the Secretary. The relief granted included, as provided by the Act, awards of back pay and liquidated damages for most of the waiters. FLSA § 16, 29 U.S.C. § 216.

The district court ruled that 15 of the waiters (together with seven other former or present employees) were entitled to $51,-880.68 in back pay, and a like amount in statutory liquidated damages. The court found that Tango's books reported these waiters as working a uniform 40 hour week at an hourly rate of $2.95 per hour. Although the waiters had been paid this amount by Tango's, they had generally worked six days a week and had averaged 53 hours a week. Further, under the Act the minimum wage in force at the time of their employment was $3.35 per hour (FLSA § 6(a)(1), (c)(1)(B), 29 U.S.C. § 206(a)(1), (c)(1)(B)), with "time and a half" the employee's regular rate for hours in excess of 40. FLSA § 7(a)(1), 29 U.S.C. § 207(a)(1). The waiters had also averaged about $66 per day each in tips which they pooled, divided, and retained.

The district court held, over the Secretary's objection, that the defendants were entitled to treat a portion of the tips received by the waiters as a credit against the defendants' minimum wage and overtime compensation obligations. The Act permits such a "tip credit" under certain conditions, including a requirement (described more fully below) of notice to the employees. FLSA § 3(m), 29 U.S.C. § 203(m). The district court found that the notice requirement had been met in this case and allowed the defendants to take a tip credit of 40 cents per hour for both the minimum wage and overtime compensation. This credit eliminated any underpayment for the first 40 hours ($2.95 + 40 cents = $3.35) and reduced the defendants' liability for overtime hours and liquidated damages.

The district court declined to order any back pay award for Manuel Santiago, who acted both as a waiter and as the manager of other waiters. Santiago was also carried on Tango's books as working a 40 hour week at $2.95 per hour. In fact he was paid not only the book figure of $118 per week (40 × $2.95) but an additional off-book payment of $200 per week, regardless of hours actually worked. The trial judge found that Santiago's hours of work varied from week to week but averaged 58 hours·

a week. Santiago shared tips on the same basis as the other waiters. The district court ruled that Santiago's wages of $318 per week adequately compensated him for his 58 hours of work, and it added that he was in any event an involuntary plaintiff and responsible for the illegal practices that led to the case.

This appeal followed. In this court, the Secretary contends that no tip credit should have been allowed in computing liability to the waiters and that Santiago was entitled to an award for uncompensated overtime.

## II. THE TIP CREDIT

A stranger to the FLSA might suppose that, in determining an employer's minimum wage obligations, the tips regularly received and retained by an employee either would be treated as wages paid by the employer or, in the alternative, would be wholly ignored. Instead, in a legislative compromise, Congress chose to allow employers a partial tip credit if, but only if, certain conditions are met. At the time of the employment in this case, section 3(m) of the Act provided that in computing minimum wages the employer could treat as wages paid by the employer tips actually received by the employee up to "an amount determined by the employer but not ... in excess of 40 per centum of the applicable minimum wage." *See* 29 U.S.C. § 203(m) (1982). Section 3(m) also provided, however, that this tip credit provision would not apply unless

"(1) such employee has been informed by the employer of the provisions of this subsection, and

(2) all tips received by such employee have been retained by the employee [except that pooling of tips among tipped employees is permitted]."

In this case, the Secretary called at trial eight waiters who testified uniformly that defendants had told them nothing about either the minimum wage or Tango's intention to treat tips as wages under the Act. Jorge and Vilma Carcavallo each testified at trial, as did the waiter-manager Santiago, but none of the three testified that the waiters had been notified of either the min-

imum wage or the tip credit. The Secretary's compliance officer allowed a 40 cent tip credit in his investigative report, but the Secretary tells us that this was a tentative allowance made prior to the waiters' trial testimony and that the compliance officer relied in part on an affidavit of Vilma Carcavallo, asserting that at the outset of employment each waiter was told that Tango's utilized a tip credit against its minimum wage obligations. We are further told that the affidavit was not offered at trial nor did Vilma Carcavallo repeat this assertion in her testimony.

█ The trial judge nevertheless found that "the waiters were told that the restaurant would utilize a tip credit against its obligations to pay minimum wages" to the waiters. The court said that it did not find the waiters' denial of notice credible because employees would not be likely to accept employment at $2.95 an hour when San Juan offered many jobs at the minimum wage of $3.35. The court stressed that the waiters had received and retained substantial tips and that the compliance officer had allowed the tip credit on the first 40 hours of work. The Secretary contends that the trial court erred in ruling that notice had been given. We agree with the Secretary.

Section 3(m) requires as a condition of the tip credit that the employee be informed by the employer "of the provisions of this subsection...." The core provisions of section 3(m) allow an employer to take a tip credit against the employer's minimum wage obligations, in an amount to be determined by the employer, subject to certain limitations. We read section 3(m) to require at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations. It could easily be read to require more—for example, notice of "the amount ... determined by the employer" to constitute wages—but how much more need not be decided in this case.

█ As the finder of fact, the district judge may be reversed only where a find-

ing is "clearly erroneous." Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). As the record stands, we are pointed to substantial, uniform testimony that the minimum wage or tip credit was never mentioned to the waiters but cited to no evidence that Tango's gave its waiters any notice of either. The inference that notice was given, drawn by the trial judge, seems to us to be faulty. The waiters' willingness to work for wages of $2.95, where $3.35 might be earned in other available jobs, might be some proof that the waiters expected to earn and retain their tips, but it does not suggest even mildly that the waiters knew anything of the minimum wage laws or defendants' intention to claim a tip credit against their obligations.

As for the investigating officer, he testified at trial that no notice of the tip credit was given to the waiters and "no one [among the waiters] even knew what a tip credit meant"; that in making his calculations he nevertheless allowed a 40 cent tip credit for each waiter's first 40 hours a week; and that he did so not because the law warranted it but because the tips were actually paid and the officer thought a tip credit "would be more fair." This testimony plainly undercuts, rather than supports, a claim that notice was given. Cases are ordinarily decided in accordance with the evidence presented at trial. Defendants have provided no reason or precedent to bind the government by its agent's generous impulse to be "fair" in making his computations.

We have considered whether defendants were misled to their prejudice by the Secretary's change of position. Prior to trial the Secretary said that she did not challenge the tip credit as applied to the waiters' first 40 hours but only as applied to their overtime compensation. When the Secretary altered her position after trial, in light of the evidence, defendants made no claim that they had proof of notice which they had not offered at trial, nor do they make such a claim now. Further, notice of the tip credit was at issue in the trial (because of the Secretary's overtime claim), so defendants had ample reason to offer what proof they had, and they apparently offered none.

It may at first seem odd to award back pay against an employer, doubled by liquidated damages, where the employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements. Yet Congress has in section 3(m) expressly required notice as a condition of the tip credit and the courts have enforced that requirement. *See Richard v. Marriott Corp.*, 549 F.2d 303, 305 (4th Cir.), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977); *Bonham v. Copper Cellar Corp.*, 476 F.Supp. 98, 101–02 (E.D.Tenn.1979); *Donovan v. 75 Truck Stop Inc.*, 92 Lab. Cas. (CCH) ¶ 34,071, at 44,091 (M.D.Fla. 1981). It does not matter in this case (although it might were the adequacy of a specific notice in issue) whether Congress deemed notice a matter of fairness to the employee, a device for enforcing minimum wage payments, or both. If the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide.

Accordingly, on this issue we reverse the district court and remand so that the court can recompute defendants' liability to the waiters with no tip credit allowed.

## III. SANTIAGO

In the district court, the Secretary also sought back pay for Santiago to reflect his overtime work, which the trial judge found to vary widely but to average 18 hours a week. The Secretary concedes that Santiago's fixed wage of $318 per week fully covered the minimum wage for a work week of 40 hours, as it clearly does (40 × $3.35 = $134). Yet the Secretary's brief asserts that Santiago has "received no compensation for approximately 18 hours of overtime per week." The Act not only requires payment for overtime but provides that compensation for hours in excess of 40 per week shall be paid "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." FLSA § 7(a)(1), 29 U.S.C. § 207(a)(1).

Although it deemed Santiago subject to the Act, the district court denied any award to Santiago. The court first noted that Santiago had received $318 per week and it ruled that "[t]his amount adequately compensated him for his forty (40) hours of regular work and his overtime hours up to fifty-eight (58) hours a week." The court then observed that Santiago appeared to be "an involuntary plaintiff," who supported Tango's management at the trial. Finally, Santiago was, in the court's opinion, himself "responsible for the implementation of the illegal practices which led to the filing of this case."

Starting with the district court's first reason, the Secretary argues to us that the district court has no warrant under the statute to decide "subjectively" that $318 is adequate compensation, for the Act plainly provides its own objective formula for minimum wages and overtime compensation. It is not clear that the trial judge intended a subjective judgment. Rather, he might well have meant that the $318 per week not only compensated Santiago at the minimum wage for the first 40 hours ($134) but left $184 to cover Santiago's remaining 18 hours of overtime at an hourly rate ($184 divided by 18 hours = $10.22 per hour) that is amply more than one and one-half times the minimum wage ($1.5 \times \$3.35 = \$5.03$).

■ Had the defendants and Santiago agreed to such a wage structure in advance—$134 for the first 40 hours and $184 for all required overtime—it is possible that this structure would have satisfied the Act, at least under certain conditions. *See* FLSA § 7(f), 29 U.S.C. § 207(f). Absent an advance agreement, the language of the Act, as construed by the Supreme Court and implemented in the Secretary's regulations, dictates a different and less favorable result. In *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942), the Supreme Court glossed the governing language of section 7(a)(1)—"one and one-half times the [employee's] regular rate"—in the case of "an employee working irregular hours for a fixed weekly wage" where the hours regularly exceeded 40 hours a week. *Id.* at 573–74, 62 S.Ct. at 1218. The Court held, for reasons explained in its opinion and best left to connoisseurs of the FLSA, that where no "regular rate" has been set by the employer for the first 40 hours, the Act treats the regular rate for that week as the fixed weekly wage divided by the number of hours actually worked in that week, including overtime hours. *Id.* at 580, 62 S.Ct. at 1221.

*Overnight*'s outcome is binding upon us and the district judge and its formula is in fact reflected in the Secretary's regulations for computing overtime compensation in the case of employees paid a "fixed salary for fluctuating hours." 29 C.F.R. § 778.114. Under the *Overnight* formula, Santiago's "regular rate" varied each week depending on the number of overtime hours he worked (*e.g.*, for a 58 hour week, his regular rate per hour would be $318 divided by 58). In effect such an employee is treated as having been paid 100% (instead of the required 150%) of the regular rate for each overtime hour, leaving 50% to be collected in the lawsuit. The Secretary's computation of back pay due Santiago in the district court, despite her present claim that Santiago received no overtime, appears to have followed the *Overnight* formula although we do not vouch for the actual computation.

■ The district court's judgment as to Santiago cannot be sustained for either of the other two reasons offered by the trial judge, even assuming that they were intended as independent grounds. Santiago may be an "involuntary plaintiff," as the district court said, but the Secretary can still sue on his behalf. FLSA §§ 16(c), 17; 29 U.S.C. §§ 216(c), 217. *See International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 808–09 (D.C.Cir. 1983), *cert. denied*, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *Donovan v. University of Texas*, 643 F.2d 1201, 1205–06 (5th Cir.1981). Indeed, payment of back wages, if proved due, is intended to protect complying competitors of the defendants, in addition to making the employee whole. FLSA § 2(a)(3), 29 U.S.C. § 202(a)(3); *International Ladies' Garment Workers'*

*Union v. Donovan,* 722 F.2d at 807–08. What would happen if an employee awarded back pay declined to accept the award is a matter for another day.

■ Similarly, the district court's bare statement that Santiago was "responsible" for the "illegal practices" seems to us an insufficient basis to deny recovery. The question whether an employee might ever be debarred from recovery under the Act because of his own role in a violation is not necessarily answered by cases, cited to us by the Secretary, that the duty to obey the Act may not be "delegated" to others by the employer. In this case, however, the district court has provided nothing to support or explain its cryptic reference to Santiago's "responsibility": we do not know whether Santiago was aware of the Act, his role in the false bookkeeping or in the fixing of waiters' wages, or his own culpability in contrast to that of defendants. Given the policy of the Act to protect employees, more detailed findings and specific justification would be needed to support an *in pari delicto* defense, assuming that such a defense would ever be allowed. The defendants, it appears, never offered such a defense in this case.

■ A final issue posed by the denial of an award to Santiago is his alleged status as an executive employee. Defendants asserted in the trial court that Santiago was exempt from coverage under the Act because he was employed in an "executive ... capacity" (FLSA § 13(a)(1), 29 U.S.C. § 213(a)(1)) as the supervisor of other waiters. The district court rejected that claim, finding that Santiago was at best a "working foreman" under the Secretary's regulations. 29 C.F.R. § 541.115. Without cross-appealing, defendants remain free to defend the judgment below on grounds not accepted by the lower court. *United States v. American Ry. Express,* 265 U.S. 425, 435–36, 44 S.Ct. 560, 563–64, 68 L.Ed. 1087 (1924). Here, defendants' brief offers a lengthy footnote again urging that Santiago was an executive employee under the statute and the Secretary's general criteria for making this determination. 29 C.F.R. § 541.1.

The regulations have special importance here because section 13(a)(1) does not define "executive ... capacity" but leaves it to the Secretary to "define[ ] and delimit[ ]" the terms. The "working foreman" regulation, closely read, does not say that a working foreman invariably falls outside the statutory category of executive. Rather, the regulation offers a description of types of working foremen to illustrate persons whose non-executive work will usually exceed the low percentage of such hours allowed to an individual under the Act and regulations before executive status is lost. *See* FLSA § 13(a)(1), 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.1(e) (40% for retail and service workers; 20% for others).

Santiago, however, was not subject to the percentage limitation on hours because, as a worker in Puerto Rico earning over $200 a week, he is classified under the regulations as a high salaried employee. 29 C.F.R. § 541.119(a)-(b). A high salaried employee is an executive employee under the regulations so long as his "primary duty consists of the management of the enterprise ... and includes the customary and regular direction of the work of two or more other employees...." 29 C.F.R. § 541.1(f). Such a high salaried employee also does not have to meet certain of the other criteria of section 541.1 that defendants claim to satisfy, *i.e.,* 29 C.F.R. § 541.1(c)-(d). *See generally Donovan v. Burger King Corp.,* 672 F.2d 221, 223–24 (1st Cir. 1982).

Santiago testified at trial that 80 percent of his time was spent supervising other waiters and the balance spent as a waiter. He said that the extra $200 he received each week was for his manager duties which he described in some detail. Under the Secretary's regulation, "primary duty" is judged on all the facts. 29 C.F.R. § 541.103. On its face, Santiago's testimony portrays him as a high salaried employee who spent most of his time engaged in, and was paid most of his wages for, the supervision of other waiters. Unless these supervisory duties are not "management," for some unspecified reason, the defendants' claim appears to have some force. *See generally*

*Donovan v. Burger King Corp.*, 672 F.2d at 226. ("The supervision of other employees is clearly a management duty.").

If there is an easy answer to defendants' claim, that answer was not obvious from our review of the Secretary's more elaborate arguments on this issue in the district court. There, the Secretary argued that the payment to Santiago of $2.95 per hour for 40 hours and his sharing of tips showed that he must have worked 40 hours as a waiter, a *non sequitur* that requires little discussion; even assuming doubtfully that the books attributed all of Santiago's first 40 hours to his service *as a waiter*, those books are admittedly false; and the inference that Santiago spent 40 hours as a waiter (and only 18 in supervision) is flatly contradicted by Santiago's direct testimony. The Secretary also said that Santiago's supervisory role did not include certain powers (importantly, to hire and fire employees) pertinent under the criteria of section 541.1, but these criteria need not be met by high salaried employees under section 541.119.

We believe that the district court may have been misled in its treatment of the executive exemption issue, first by the Secretary's inexact portrayal of the working foreman regulation as precluding executive status and, second, by the Secretary's resort to section 541.1 criteria that Santiago did not have to meet. In all events, the governing questions, not squarely addressed by the district court, are whether Santiago's "primary duty" consisted of supervisory work or service as a waiter and, if the former, whether that work involved "management of the enterprise or a customarily recognized department or subdivision thereof...." 29 C.F.R. § 541.1(f). *See also* 29 C.F.R. § 541.102 (describing management tasks as including "directing [the] work" of other employees). Because this court cannot know the record as well as the parties and the district court, we conclude that a remand for a further determination of the exemption issue is needed in light of the evidence already in that record.

## IV.   CONCLUSION

To summarize, the defendants failed to give notice as required by section 3(m). The award to the 15 waiters must therefore be recomputed to reflect the elimination of the tip credit. The Secretary's claim on behalf of Santiago is remanded to permit the district court to re-examine his status as an executive employee *vel non* under FLSA § 13(a)(1) in light of this court's opinion. If the district court concludes that Santiago does not qualify as an executive employee, then the formula set forth in *Overnight* and the regulations must be applied in determining overtime compensation due to him. Of course, the formula does not preclude averaging or estimating the number of hours worked per week where more specific information is lacking.

Before more court time is devoted to this case, we encourage the parties, as the district judge wisely did, to discuss an amicable resolution.

*The judgment of the district court is reversed as to the waiters other than Santiago for whom defendants were allowed a tip credit. As to Santiago, the judgment of the district court is vacated. The case is remanded for further proceedings consistent with this opinion.*