**Elaine VALERIO, Plaintiff, Appellant,**

v.

**PUTNAM ASSOCIATES INCORPORATED, Defendant, Appellee.**

No. 98–1399.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1998.

Decided April 9, 1999.

Rehearing Denied May 6, 1999.

---

Robert J. Gilbert with whom Jeffrey B. Renton and Gilbert & Renton, P.C. were on brief, for appellant.

William B. Koffel with whom Foley, Hoag & Eliot was on brief, for appellee.

Before SELYA, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Elaine Valerio appeals from the district court's grant of summary judgment in favor of Appellee Putnam Associates, Inc. ("Putnam"). Valerio sued Putnam under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("the FLSA"), and Massachusetts law, claiming that she was entitled to excess pay for overtime hours worked during her employment with Putnam, and that she was terminated in retaliation for requesting such pay. She now contends that the district court applied an incorrect measure in calculating her overtime pay and erred in ruling that her complaint to her

supervisors was not protected activity. We affirm the district court's rulings regarding her claim for overtime pay and her claim for retaliation under Massachusetts law, but reverse the lower court's ruling as to her claim for retaliation under the FLSA.

## I. BACKGROUND

In October, 1994, Valerio was hired by Putnam, a health-care consulting firm, for a "Receptionist/Administrative Assistant" position. Her duties included answering telephones, receiving packages, performing research from libraries and on-line databases, maintaining client files, and other miscellaneous tasks. Putnam told her at the time she was hired that the position was considered "exempt" under the FLSA and she therefore would not be entitled to overtime pay (the district court later determined that this classification was incorrect).

In June, 1995, as part of Putnam's normal employee review process, Valerio submitted a form entitled "Performance Review/Self Evaluation." She wrote that she hoped she would be "relieved of all receptionist duties and [would instead] concentrate on research and admin[istration]." Valerio's immediate supervisor, Office Manager Lisa Patterson, responded to Valerio's comments by telling her that the company did not anticipate relieving her from receptionist duties anytime soon. She also gave Valerio an oral evaluation of her performance, reminding her that she needed to be at the office at 8:30 a.m. to answer incoming phone calls.

Two months later, in August, 1995, Valerio began attending law school classes during the evenings. During the first week of that month, Patterson again met with Valerio to discuss her job performance and expressed concern with Valerio's punctuality. In order to determine whether her admonitions were effective, Patterson began keeping a written record of Valerio's daily arrival and departure

times. She did not tell Valerio she was doing this.

On September 7, 1995, Patterson wrote a lengthy letter to Valerio which stated in part:

Punctuality. No matter what you believe as far as this job was described to you (i.e. you claim it was never expressly mentioned that this was a receptionist position) you were and are aware that answering the phone is part of the job. This means being here when the office officially opens at 8:30 a.m. and staying till it closes.

Patterson also stated that Valerio's recent enrollment in law school night classes suggested that she was not "serious about a career with Putnam."

On September 12, 1995, Valerio responded by letter. She wrote in part: I will repeat to you once again that I am not a receptionist. I am classified as an exempt, salaried employee and according to the Fair Labor Standards Act published by the Department of Labor, a receptionist, by the nature of the job, not the title, cannot be an exempt employee. If you insist on classifying me as a receptionist, then I demand under FLSA that I be reclassified as non-exempt and be paid for all overtime hours worked. My salary, offer letter and business cards all indicate that my position is Research Associate. Answering the phones is only one part of my job ... Additionally, I feel I must disclose to you that I am considering complaint options and have contacted the Department of Labor. I would also remind you that, "It is a violation of the Fair Labor and Standards Act (FLSA) to fire and in any manner discriminate against an employee for filing a complaint or participating in a legal proceeding under FLSA" and that "willfull violations of FLSA may be prosecuted criminally and the violator fined up to ten thousand dollars." ... If you retract your letter and abide by the terms of my employment agreement, I will

walk away from these issues with our professional relationship intact. I will be diligent in my job performance (as my last raise attests) and hold no hard feelings. I would appreciate it if any further communications on this matter be in writing.[1]

On September 19, 1995, Kevin Gorman, Putnam's CEO, terminated Valerio, stating that the introduction of a new network modem system had eliminated the need for a Research Associate. Gorman gave her a letter confirming her termination and a final paycheck that included $1,660.59, which the letter stated was "the equivalent of overtime pay which might be applicable under the Department of Labor FLSA Regulation 29 C.F.R. § 778.114." Gorman later testified under deposition that Valerio's deteriorating relationship with Patterson was the "straw that broke the camel's back."

Valerio then instituted the present action. The district court granted summary judgment in favor of Putnam, holding that, while Valerio was a non-exempt employee and thus entitled to overtime pay under the FLSA, Putnam's $1,660.59 severance payment was more than what was required by the applicable "half-time" overtime provisions. The lower court also dismissed her claims for retaliatory termination, ruling that her sending the September 12, 1995, letter to her supervisors did not constitute protected activity under the FLSA or Massachusetts law. Valerio appeals, challenging each of these rulings.

## II. DISCUSSION

### A. The Overtime Pay Claim

The parties do not contest the district court's conclusion that Valerio was entitled to overtime pay under the FLSA. They dispute only the amount.

The FLSA's basic overtime provision states,

---

1. While the exact nature of Valerio's contact with the Department of Labor is not clear, she admits that she had not filed a formal complaint with the Department.

[e]xcept as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods in commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The phrase "the regular rate at which [an employee] is employed" is not self-defining. *See Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1324 (1st Cir.1992). Rather, the Supreme Court "has glossed the governing language ... in the case of 'an employee working irregular hours for a fixed weekly wage' where the hours regularly exceeded 40 hours a week." *Id.* (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 573–74, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942)). This gloss is reflected in the overtime compensation regulations, which provide two methods by which to calculate an employee's "regular rate" of pay. The first applies if the employee is paid a fixed weekly salary for a specific number of hours to be worked each week. 29 C.F.R. § 778.113(a) ("Section 113"). The second applies if the employee is paid a fixed weekly salary regardless of how many hours the employee may work in a given week. *Id.* at § 114(a) ("Section 114").

By its own terms, Section 114 applies only if there is "a clear mutual understanding of the parties" that the fixed salary is compensation for however many hours the employee may work in a particular week, rather than for a fixed number of hours

per week. In granting summary judgment for Putnam, the district court found that there was no genuine dispute that, at the time Valerio was hired, she knew that her weekly hours would fluctuate. Valerio argues that her deposition testimony suggests otherwise. We have read the testimony with care and disagree.

■ We agree with the district court that, even viewed in a light most favorable to Valerio, the deposition testimony demonstrates that Valerio understood that her fixed weekly salary was to be compensation for potentially fluctuating weekly hours. She admits she was told that the hours were indefinite—"8:30 to whenever"—and that she understood that there "possibly" could be work days that would last longer than eight hours. She also understood, and accepted at the time, that Putnam did not intend to provide overtime pay if she worked more than 40 hours in a particular week.[2]

Additionally, the evidence of the parties' post-hiring conduct reinforces Putnam's contention that Valerio understood that her salary was to compensate her for fluctuating hours. During the first eleven months of her employment, Valerio routinely worked without complaint more than 40 hours per week without extra pay. *See Mayhew v. Wells*, 125 F.3d 216, 218 (4th Cir.1997) ("[T]he existence of [a 'clear mutual understanding'] may be based on the implied terms of one's employment agreement if it is clear from the employee's action that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise."); *Zoltek v. Safelite Glass Corp.*, 884 F.Supp. 283, 286–87 (N.D.Ill.1995) (court inferred an "implied-in-fact agreement" that employee was to receive the same salary regardless of how many hours worked where he had worked

---

2. We attach little weight to Valerio's argument that the several equivocal statements in her testimony created a genuine dispute as to this material issue. For example, she highlights the statements, "I said I would work full-time" and "My expectation of full-time work is 40 hours a week." These remarks, however, were not directly responsive to the question being asked. Rather, they are somewhat abstract comments that are later belied by her specific admissions that she understood she would "possibly" have to work longer than eight hours per day and would not receive extra compensation in such event.

fluctuating hours for 30 months for a consistent salary and never protested).

Valerio contends that this inference is tantamount to "blaming the victim." The question, however, is simply the narrow one of applying Section 114 in accordance with its terms, which means determining whether there existed a "clear mutual understanding" that Valerio's fixed salary would be compensation for however many hours she worked each week. If so, Section 114 applies for purposes of calculating "the regular rate at which [the employee] ... is employed." The evidence demonstrates without material contradiction such a "clear mutual understanding."

■ Valerio argues that section 114 requires that the "clear mutual understanding" must extend to how her overtime premiums should be calculated. Because the parties initially agreed that she would not receive any additional payments for overtime hours, no agreement regarding calculation of overtime existed. But the regulation calls for no such enlarged understanding. *See Bailey v. County of Georgetown*, 94 F.3d 152, 156–57 (4th Cir. 1996) (rejecting as "contrary to the plain language of the FLSA and [Section 114]" the notion that employers and employees who have adopted a fluctuating pay plan must understand the manner in which overtime pay will calculated). The parties must only have reached a "clear mutual understanding" that while the employee's hours may vary, his or her base salary will not.

In short, the district court correctly applied Section 114. And, because Valerio received even more overtime payment ($1,660.59) in her final paycheck than she was entitled to under Section 114,[3] Putnam's obligation under the FLSA was extinguished and summary judgment was appropriate. *See* 29 U.S.C. § 216(b) ("Any employer who violates the provisions [of

this Act] shall be liable to the employee ... affected in the amount of [her] ... *unpaid* overtime compensation[.]") (emphasis supplied).

■ Much the same reasoning disposes of Valerio's claim under the Massachusetts overtime statute. Valerio argues that because the Massachusetts statute has no analogue to Section 114, it requires "time-and-a-half" overtime premiums be paid across-the-board, even to employees who agreed to receive fixed salaries for fluctuating workweeks. We do not agree. The basic overtime provision of the Massachusetts statute is essentially identical to the FLSA. *Compare* 29 U.S.C. § 207(a)(1) *with* M.G.L. c. 151, § 1A. Massachusetts adopted its nearly-identical statute almost twenty years after the Supreme Court decided *Overnight Motor* and nearly a decade before *Overnight Motor's* gloss was formally codified in Section 114. The absence of a direct Massachusetts analogue to Section 114 is, therefore, immaterial. To our knowledge, no Massachusetts court has even suggested the distinction Valerio seeks to advance, and, tellingly, she cites to no such case. We conclude that both the FLSA and Massachusetts law compel the same outcomes. *Cf. Fakouri v. Pizza Hut of America, Inc.*, 824 F.2d 470 (6th Cir.1987).

## B. The Retaliation Claim

The district court granted summary judgment for Putnam on Valerio's claim for retaliatory termination, ruling that her internal complaint on September 12, 1995 was not protected activity under either the FLSA or Massachusetts law. We consider the federal law and state law issues in turn.

### (1) Retaliation Under the FLSA

The FLSA's anti-retaliation provision states:

> time week (i.e., some number above 40), it divided her weekly salary by 40 hours and arrived at a higher hourly rate.

---

3. As the district court noted, Putnam erred in Valerio's favor when it applied Section 114. Instead of dividing her weekly salary by the number of hours actually worked in an over-

[I]t shall be unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in 'any such proceeding, or has served or is about to serve on an industry committee[.]

29 U.S.C. § 215(a)(3). The question raised here is of first impression in this Circuit: whether FLSA's prohibition on terminating an employee who "has filed any complaint or instituted or caused to be instituted any proceeding" under or related to the FLSA protects an employee who has lodged a written internal complaint with his or her employer but has not filed a judicial or administrative complaint. Federal courts of appeals grappling with this issue have differed. To date, the Sixth, Eighth, Tenth, and Eleventh Circuits have held that an internal complaint to the employer may satisfy § 215(a)(3), *see EEOC v. Romeo Community Schools*, 976 F.2d 985, 989–90 (6th Cir.1992); *EEOC v. White & Son Enterprises*, 881 F.2d 1006, 1011 (11th Cir.1989); *Love v. Re/Max of America, Inc.*, 738 F.2d 383, 387 (10th Cir.1984); *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 181 (8th Cir.1975), while the Second Circuit, as well as a previous panel of the Ninth Circuit, have held that a formal complaint to the government agency or a court is required. *Lambert v. Genesee Hospital*, 10 F.3d 46 (2d Cir. 1993); *see also Lambert v. Ackerly*, 156 F.3d 1018 (9th Cir.1998); *withdrawn and reh'g granted*, 169 F.3d 666 (9th Cir.1999).

■ This is indeed a close question, but we side with the Sixth, Eighth, Tenth, and Eleventh Circuits. In deciding that the FLSA's protections against retaliation are triggered only by a formal filing with a court or agency, the Second Circuit concluded that § 215(a)(3) is unambiguous. *See Genesee Hospital*, 10 F.3d at 55. We do not agree. We read the phrase "has filed any complaint" as susceptible to differing interpretations. The word "complaint" itself is certainly ambiguous. Web-

ster defines "complaint" as either "the act or action of expressing protest, censure, or resentment: expression of injustice ([for example] about poor housing)" or as a "formal allegation or charge against a party made or presented to the appropriate court or officer (as for a wrong done or a crime committed) and variously applied ... " Webster's Third New Int'l Dictionary 464 (1971). By failing to specify that the filing of any complaint need be with a court or an agency, and by using the word "any," Congress left open the possibility that it intended "complaint" to relate to less formal expressions of protest, censure, resentment, or injustice conveyed to an employer. *Cf. Clean Harbors Environ. Serv., Inc. v. Herman*, 146 F.3d 12, 19 & n. 7 (1st Cir.1998) (concluding that the phrase "filed a complaint or begun a proceeding" in the anti-retaliation provision of the Surface Transportation Assistance Act, 49 U.S.C. § 31105(a)(1)(A), is ambiguous because "the language does not say where a complaint must be filed").

The strongest case for non-ambiguity rests perhaps with the verb "filed." Had Congress spoken of "making" or "voicing" any complaint there would be no question it intended to include protests as well as purely "legal" complaints. Webster defines "file" both as "to deliver (as a legal paper or instrument) after complying with any condition precedent (as the payment of a fee) to the proper officer for keeping on file or among the records of his office" and "to place (as a paper or an instrument) on file among the legal or official records of an office esp[ecially] by formally receiving, endorsing, and entering." Webster's Third New International Dictionary, at 849. But while file doubtless formalizes matters, the second definition of "file" is sufficiently elastic to encompass an internal complaint made to a private employer with the expectation the employer will place it on file among the employer's offi-

cial records.[4] *Compare Lundervold v. Core–Mark Int'l, Inc.,* 1997 WL 907915 (D.Or. Jan.17, 1997) (concluding that interpreting the word "filed" in § 215(a)(3) to require a written complaint "[i]nstead of simplifying matters, ... simply trade[s] one set of problems for another.")

■ Furthermore, if "filed any complaint" were read to encompass only filings with a court or government agency, one would wonder why the additional language "or instituted or caused to be instituted any proceeding under or related to this chapter" was inserted. The latter words become surplusage if the former means only the filing of in-court or in-agency complaints. *See Clean Harbors,* 146 F.3d at 20. When engaged in statutory interpretation, courts may "assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning." *Bailey v. United States,* 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

Moreover, the word "any" embraces all types of complaints, including those that might be filed with an employer. We con-clude, therefore, that the statute does not have a plain language meaning restricted to "legal" complaints but rather is ambiguous as to the meaning of the word "complaint." Given that ambiguity, we look further to discern Congress's intent.

■ The legislative history of the FLSA unfortunately provides no real guidance as to the intended scope of § 215(a)(3).[5] We find some assistance, however, in the broad purpose of the FLSA, as interpreted by the Supreme Court. The FLSA has been treated as remedial in purpose. *See Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). "For ... practical and other reasons," Congress sought to secure compliance with the substantive provisions of the Act by having "employees seeking to vindicate rights claimed to have been denied" lodge complaints or supply information to officials regarding allegedly substandard employment practices and conditions. *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Congress recognized that "fear of economic retaliation

---

**4.** We may question how far one may go to permit a written complaint to be augmented orally. *Cf. Clean Harbors Environ. Servs., Inc., supra,* where the panel spoke of the combination as "filed." We leave for another day whether combined oral and written complaints, or alleged complaints of a wholly oral nature, allow invocation of the protections of § 215(a)(3).

**5.** When faced with a statutory provision that is susceptible to more than a single reasonable interpretation, we would normally defer to the administrative agency charged with enforcing the statute, assuming the agency had explicitly adopted its own reasonable interpretation of the statute. *See Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, however, it appears that neither the Department of Labor nor the Equal Employment Opportunity Commission has taken a definite stance as to the proper interpretation to give § 215(a)(3). The EEOC's Compliance Manual states that "[t]he prohibition against retaliation extends not only to an employee who has asserted a statutory right under the FLSA but to an employee who has opposed unequal pay, *even if the employee has not filed a complaint or instituted a proceeding.* [Citing *Love,* 738 F.2d 383 (10th Cir. 1984)]." EEOC Compliance Manual § 704.3, at 4535 (1998) (emphasis supplied). The citation to *Love* would suggest that the EEOC interprets § 215(a)(3) broadly to encompass informal employee complaints. However, we are not bound by this statement for two reasons. First, it is unclear whether the EEOC Compliance Manual is even an appropriate vehicle for the expression of the agency's interpretation. *See* Kenneth Culp Davis & Richard J. Pierce, Administrative Law Treatise § 3.5, at 119 (3d ed. 1994) ("[*Chevron*] should not be held to apply to agency pronouncements in less formal formats, e.g., manuals, letters, guidelines, interpretive rules, or litigating positions."). Second, insofar as it appears that the Compliance Manual based its position merely on its reading of judicial precedent, i.e. the Tenth Circuit's decision in *Love,* as opposed to the agency's own interpretation, its statement is not binding on us. *See Hodgson & Sons v. Federal Energy Regulatory Comm'n,* 49 F.3d 822, 826 (1st Cir.1995).

might often operate to induce aggrieved employees quietly to accept substandard conditions." *Id.*

The Supreme Court has stated that the FLSA "must not be interpreted in a narrow, grudging manner." *Tennessee Coal,* 321 U.S. at 597, 64 S.Ct. 698. The Court also spoke of the "remedial and humanitarian" purposes of the Act, *id.,* which, as we explain *infra,* would hardly be furthered by a narrow reading of § 215(a)(3). Under a construction limiting the protections of the anti-retaliation provision to the filing of judicial or agency complaints, an employer would be free to discharge an employee in retaliation for asserting rights under the Act, so long as the employer acted prior to the formal filing of such a complaint or the institution of a proceeding under the Act. By protecting only those employees who kept secret their belief that they were being illegally treated until they filed a legal proceeding, the Act would discourage prior discussion of the matter between employee and employer, and would have the bizarre effect both of discouraging early settlement attempts and creating an incentive for the employer to fire an employee as soon as possible after learning the employee believed he was being treated illegally.[6]

A narrow construction of the anti-retaliation provision could create an atmosphere of intimidation and defeat the Act's purpose in § 215(a)(3) of preventing employees' attempts to secure their rights under the Act from taking on the character of "a calculated risk." *Mitchell,* 361 U.S. at 293, 80 S.Ct. 332. Such circumstances would fail to "foster a climate in which compliance with the substantive provisions of the Act would be enhanced." *Id.* at 292, 80 S.Ct. 332. Hence we, like many of our sister circuits, conclude that the animating spirit of the Act is best served by a construction of § 215(a)(3) under which the

filing of a relevant complaint with the employer no less than with a court or agency may give rise to a retaliation claim.

Our own precedent in a closely related area supports this interpretation. In *Clean Harbors,* a panel of this Court interpreted very similar language in the anti-retaliation provision of the Surface Transportation Assistance Act of 1982 ("STAA") to include internal employee complaints. The STAA's anti-retaliation provision states:

> A person may not discharge an employee regarding pay, terms, or privileges of employment because the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety regulation, standard, or order, or has testified or will testify in such a proceeding[.]

49 U.S.C. § 31105(a)(1)(A). The *Clean Harbors* panel concluded that this language protected an employee who had filed purely "intracorporate" complaints about alleged violations of federal transportation safety law. *See Clean Harbors,* 146 F.3d at 14.

The panel cited four bases for its decision. First, the statutory language was ambiguous, in that it did not specify where a complaint must be filed. *Id.* at 19 & n. 7. Second, "Congress hewed to this language when it reenacted the STAA in 1994, in the face of long-standing administrative interpretation of the STAA and similar language in other statutes to encompass internal complaints made to an employer." *Id.* at 19. One of the cited "other statutes" with "similar language" was the FLSA; the panel referred to the courts of appeals decisions interpreting § 215(a)(3) to encompass internal complaints. *See id.* at 20. The panel also cited other decisions

---

**6.** It is no answer to say that the employee could protect himself or herself by first filing a formal complaint with a court or agency, then lodging an internal complaint with the employer. This mode of proceeding would

stimulate the bringing of ill-considered legal proceedings and greatly cut back the opportunity for amicable and constructive negotiations.

that interpreted analogous whistleblower protection provisions in the Clean Water Act, 33 U.S.C. § 1367(a), and the Federal Railway Safety Act, 45 U.S.C. § 441. Third, the panel explained that it owed deference to the Department of Transportation's interpretation under *Chevron* because "in the absence of unambiguous statutory language, this strikes us as the sort of interstitial law making which Congress left to the agency." *Clean Harbors*, 146 F.3d at 19. Fourth, the panel described the agency's policy choice to protect internal complaints to employers as "eminently reasonable." *Id.*

Putnam contends that *Clean Harbors* should not guide our decision as some of the factors animating the *Clean Harbors* decision are not present here. The factor of legislative acquiescence is not present here and, as explained previously, we discern no statement of agency position sufficient for deference under the principles of *Chevron. See supra*, n. 5. Putnam asserts further that *Clean Harbors* is of limited value to the present issue because the FLSA and the STAA have "very different purposes and enforcement schemes" that demand different interpretations of their respective anti-retaliation provisions. Putnam's argument, in essence, is that because the STAA concerns public health and safety, it is essential that employees be encouraged to inform their supervisors of regulatory violations immediately so that they can be promptly remedied; in the FLSA context, however, the need for dispatch is diminished. Because violations of the FLSA do not pose direct and immediate threats to public safety, Putnam asserts, Congress must have intended to require FLSA complainants to avail themselves of judicial or administrative remedies.

While the above contentions have some force, they are not wholly persuasive. The need for dispatch in correcting safety violations is only one of the many objects of the STAA's anti-retaliation regime. As the *Clean Harbors* panel explained, forcing employees with safety concerns to go straight to the government would deny the company an opportunity to "remedy its own problems voluntarily and quietly." *Id.* at 21. Internal complaints may be seen as benefitting not only the employee, but the employer as well. *Id. See also id.* at 19 (recognizing the value of "leveraging the government's limited enforcement resources"). Finally, and perhaps most importantly, the *Clean Harbors* court noted the value of protecting employees "who in good faith assert safety concerns to their employers, or who indicate an unwillingness to engage in such violations" by "casting a broad net in the [field of] anti-retaliation provisions." *Id.* at 21. The *Clean Harbors* panel recognized, as we do *supra*, that "fear of economic retaliation might operate to induce aggrieved employees to accept substandard conditions." *Mitchell*, 361 U.S. at 292, 80 S.Ct. 332. In sum, many of the animating policies cited by the *Clean Harbors* panel apply with equal force to violations of the FLSA.

We hold, therefore, that the FLSA's anti-retaliation provision will protect an employee who has filed a sufficient complaint with an employer.

 Of course, not all abstract grumblings will suffice to constitute the filing of a complaint with one's employer. As the *Clean Harbors* panel acknowledged, affording protection to employees who lodge purely intracorporate complaints "unhelpfully leaves employers in the dark" as to what types of assertions will rise to the level of protected activity by their employees. *Clean Harbors*, 146 F.3d at 21. We agree that "[t]here is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the [statute.]" *Id.* at 22. Even putting oral complaints aside, as we do in this case, *see* note 4, *supra*, written comments and criticisms made to an employer may not always amount to filed complaints "under or related to this chapter." 29 U.S.C. § 215(a)(3).

We conclude, as did the panel in *Clean Harbors*, that we have little choice but to proceed on a case-by-case basis, addressing as a matter of factual analysis whether the internal communications to the employer were sufficient to amount to the "filing of any complaint" within the statutory definition.

■ Here, we conclude that Valerio's September 12, 1995 letter was sufficiently definite to notify Putnam that she was asserting her statutory rights to overtime pay. She wrote to Lisa Patterson, who was her direct supervisor and Putnam's Office Manager, that, at least as long as she was required to be a receptionist, she was misclassified. as exempt under the FLSA, and was entitled to overtime pay. While Valerio seems also to have indicated a preference to remain as a Research Associate and perhaps therefore an exempt employee (foregoing the receptionist label), she stated she was "considering complaint options and have contacted the Department of Labor." She quoted the relevant statutory language regarding her claim and threatened legal action if retaliation took place.

Putnam insists that the letter should be read not as a complaint itself, but merely a negotiating tool, with the possibility of a complaint to the Department of Labor to follow if Valerio's demands were not met. Putnam emphasizes that the letter concludes with a statement in the conditional form: "If you retract your letter and abide by the terms of my employment agreement, I will walk away from these issues with our professional relationship intact."

We disagree with Putnam's argument for several reasons. First, it presupposes that a "complaint" under the FLSA must be filed with the administrative agency, a notion which, as explained previously, we reject. Second, it overlooks the very explicit references to the FLSA and Valerio's stated intention to pursue remedies under the Act if Putnam failed to meet her concerns. *See Clean Harbors*, 146 F.3d at 21. Other courts have classified as "com-

plaints" statements far less definite than those here. *See Romeo Community Schools*, 976 F.2d at 989 (plaintiff who told school district that she believed they were "breaking some sort of law" by paying her lower wages than previously paid to male employees had "filed any complaint" under the FLSA); *White & Son Enterprises*, 881 F.2d at 1007–08 (female employees who met with company owner and foreman and asked for equal pay had "filed any complaint"). Third, while the letter ends with an olive branch, its tone and overall content could not have left Putnam with any doubt that Valerio was complaining that she was mis-classified and was asserting her right to overtime pay, unless, at least, Putnam was prepared to reclassify her in accordance with her wishes. Putnam never did so—and it now concedes Valerio was all along entitled to overtime pay. We do not think it lies in Putnam's mouth to claim the benefit of a condition it at all times rejected. We, therefore, reject Putnam's contention that Valerio's letter was not a protected complaint but merely some form of unprotected negotiating tool.

(2) *Retaliation Under Massachusetts Law*

■ We must also consider how our explication of the FLSA requirements affects Valerio's retaliation claim under Massachusetts law, as she had alleged that "[a]nalogous protections exist under state law." *See* Complaint, ¶ 23. The district court dismissed this claim, ruling that Massachusetts does not appear to recognize a common law cause of action where the relevant public policy has already been vindicated by a state or federal statute. We agree, relying principally upon the decision of the Massachusetts' Supreme Judicial Court ("SJC") in *Melley v. Gillette Corp.*, 397 Mass. 1004, 491 N.E.2d 252 (1986).

In *Melley*, the SJC was asked to decide whether a plaintiff who had failed to follow the procedures set forth in Massachusetts' employment discrimination statute, M.G.L. c. 151B, could nevertheless bring an age

discrimination claim based on a common law theory of wrongful termination. The SJC adopted the analysis and conclusion of the intermediate appellate court, which had reasoned: "[t]he rationale for implying a private remedy under the 'public policy exception' to the traditional rule governing at-will employment contracts is that, unless a remedy is recognized, there is no other way to vindicate such a public policy." *Melley v. Gillette Corp.*, 19 Mass. App.Ct. 511, 475 N.E.2d 1227, 1228 (1985) (citations omitted). The intermediate court concluded that "where, as here, there is a comprehensive remedial statute, the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme." *Id.* at 1229.

To be sure, *Melley* did not address the precise issue presented here, as it involved the effect of a comprehensive state statute in the field, as opposed to a federal one. However, were the SJC faced with the present situation, we do not believe that the federal nature of the statutory remedy would make a difference.[7] *Cf. Grubba v. Bay State Abrasives*, 803 F.2d 746, 747 & n. 1 (1st Cir.1986)(assuming, without deciding, that Massachusetts would not recognize a claim for breach of the implied covenant of good faith and fair dealing if the public policy was already vindicated by the federal Rehabilitation Act of 1973); *compare, e.g., Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1399 (10th Cir.1997) (Kansas would not allow a common law cause of action for retaliatory discharge when the FLSA or state statute provides an adequate remedy), *with Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166, 171 (1992) (the existence of the FLSA or the state Wage and Hour Act does not render moot North Carolina's

public policy exception unless there is federal preemption or the state statute supplants the common law via exclusive remedies).

### III. CONCLUSION

For the reasons stated, we *affirm* the district court's grant of summary judgment in favor of Putnam as to Valerio's claim for overtime pay under the FLSA and Massachusetts' overtime statute. We *vacate*, however, the district court's grant of summary judgment in Putnam's favor on Valerio's claim for retaliation under the FLSA, and *remand* for further proceedings consistent with this opinion. Last, we *affirm* the district court's grant of summary judgment in Putnam's favor on Valerio's claim for retaliation under Massachusetts law.

*So ordered.*

*Each party to bear its own costs.*

---

**7.** Valerio does not appear to argue otherwise. On this point, her brief is devoted mostly to arguing that, if the panel concludes that § 215(a)(3) of the FLSA requires the filing of a formal complaint with a court or government agency, then it should recognize a wrongful termination cause of action under

Massachusetts common law that is triggered by an employee's internal complaint. She *does not* address directly the issue posed here, i.e., whether her retaliation claim under Massachusetts law survives once we have determined that her retaliation claim under the FLSA should in fact proceed.