In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3117

BRENDA URNIKIS-NEGRO,

*Plaintiff-Appellant,*

*v.*

AMERICAN FAMILY PROPERTY
SERVICES, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6014—**Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 11, 2009—DECIDED AUGUST 4, 2010

Before BAUER, ROVNER and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Although plaintiff Brenda Urnikis-Negro prevailed in her suit for overtime pay, she contends on appeal that the district court improperly calculated the amount of pay she is owed. After a bench trial, the district court found that defendants American Family Property Services and its owners and officers, Todd and Nichole Lash, violated the Fair Labor

Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), when they mistakenly treated Urnikis-Negro as an administrative employee who was exempt from the overtime provisions of the statute. *Urnikis-Negro v. Am. Family Prop. Servs., Inc.*, No. 06 C 6014, 2008 WL 5539823, at *5-*9 (N.D. Ill. Jul. 21, 2008); *see* 29 U.S.C. §§ 207, 216(b). The FLSA sets the standard workweek at 40 hours and requires employers to pay their non-exempt employees one and one-half times their regular rate of pay for any hours worked in excess of 40. § 207(a)(1). Urnikis-Negro was never paid anything above her fixed salary for her overtime hours.

However, in calculating Urnikis-Negro's regular rate of pay and thence the overtime to which she was entitled, the court used the fluctuating workweek ("FWW") method set forth in 29 C.F.R. § 778.114(a), an interpretive rule promulgated by the Department of Labor. 2008 WL 5539823, at *11-*12. The FWW method calculates an employee's regular rate of pay by dividing her weekly wage by the total number of hours she works in a given week rather than by 40. Where, as here, the employee regularly works more than 40 hours per week, the FWW method results in both a lower regular rate of pay and a significantly lower award of overtime pay. The propriety of relying on section 778.114(a) and the FWW method in cases where the plaintiff has been miscategorized by her employer as exempt from the FLSA's overtime provision has divided the federal courts.

We agree that section 778.114(a) itself does not provide the authority for applying the FWW method in a

misclassification case. That rule sets forth one way in which an employer may lawfully compensate a nonexempt employee for fluctuating work hours; it is not a remedial measure that specifies how damages are to be calculated when a court finds that an employer has breached its statutory obligations.

Irrespective of the rule, however, it was appropriate for the district court to apply the FWW method in this case. The authority to do so is found in the Supreme Court's decision in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 62 S. Ct. 1216 (1942), *superseded on other grounds by statute as stated in Trans World Air Lines, Inc. v. Thurston*, 469 U.S. 111, 128 n.22, 105 S. Ct. 613, 625 n.22 (1985), which approved this very method of calculating of an employee's regular rate of pay and corresponding overtime premium. We therefore affirm the district court's judgment.

## I.

Our summary of the facts is taken largely from the district court's own factual determinations. Although we have not been provided with a complete record of the testimony and other evidence presented at trial, the district court's findings of fact are not challenged in this appeal; the appeal instead presents a legal question as to the proper determination of Urnikis-Negro's regular rate of pay and the overtime premium to which she is entitled.

American Family Property Services ("AFPS") was a real estate appraisal firm owned by Todd and Nicole

Lash, who are husband and wife. Real estate appraisers are licensed by the State of Illinois. Todd Lash became licensed as an associate appraiser (which required him to complete specified training and pass a state examination) in the late 1990s and became a certified appraiser (which required experience as an associate appraiser, additional training, and a satisfactory score on another examination) in or about 2000. In 2003, the Lashes formed the firm Epic Appraisal, which later became AFPS. Lenders retained AFPS to conduct appraisals of residential properties on which they were considering making mortgage loans.

As of early 2004, Todd Lash was the sole certified appraiser at AFPS, although the firm also contracted with certified appraisers outside of the firm on occasion. Lash worked with a number of associate appraisers, some of whom were employed by AFPS and others of whom were independent appraisers who worked with AFPS on a contract basis. Typically, the associate appraisers prepared the appraisal reports for Lash's review. If and when Lash approved the report, he forwarded it to the lender that had retained AFPS to undertake the appraisal.

AFPS hired Urnikis-Negro in July 2004. Urnikis-Negro was a member of the religious congregation of which Lash was the pastor. One of her brothers already worked for AFPS as an associate appraiser, and a second brother would later join the firm. The firm's business was growing, and Lash wanted help in reviewing the reports prepared by the associate appraisers so that he could devote less time to AFPS and more time to his

religious work: "It was my intention at that point to reduce my role in the company because . . . I wanted to be a pastor who appraised on the side and not an appraiser who pastored on the side." R. 98 at 8. Urnikis-Negro had no experience in real estate appraisals. At the time she was hired by AFPS, she had been working as the office manager of the loan department at LaSalle State Bank. Lash advised Urnikis-Negro that he would train her so that she could provide the assistance he sought in reviewing the appraiser reports. He also offered to pay for appraiser training so that she could eventually become an associate appraiser.[1]

Lash agreed to pay Urnikis-Negro an annual salary of $52,000. At that time, this was the highest salary paid to anyone working at AFPS—as high as the salary Lash himself was paid. It also represented a substantial increase from the pay Urnikis-Negro had received during her employment with the bank. As the district court noted, the substantial pay reflected Lash's need to have someone at AFPS who could devote her attention to the more time-consuming aspects of the work he had been performing for the firm and thus free up time for him.

Urnikis-Negro understood that she was to be an employee of AFPS, and the district court found that this was an understanding shared by AFPS itself. 2008 WL 5539823, at *2. Nonetheless, when Urnikis-Negro re-

---

[1] During her tenure with the firm, Urnikis-Negro did manage to earn her associate appraiser's license.

ceived her first paycheck from AFPS, she discovered that the firm had paid her as if she were an independent contractor, withholding nothing from her pay for income or Social Security taxes. After she objected, the firm began making the appropriate withholdings. The district court found that AFPS's initial failure to withhold taxes was not only contrary to the understanding between the firm and Urnikis-Negro that she was an employee but amounted to a deliberate effort to circumvent the firm's legal obligations to withhold taxes from her pay. *Id.*

Lash and Urnikis-Negro did not discuss the number of hours she would be expected to work when he hired her. Although the district court credited Urnikis-Negro's testimony that she expected to work a 40-hour week, *id.* at *2, it found that she also understood that her salary was to cover whatever time she was called upon to work in a given week. *Id.* at *12. Her job with the firm was task-oriented, and her hours were likely to fluctuate with the volume of the firm's appraisal business. Yet, Lash testified at his deposition that all of the firm's employees were paid on the basis of a 40-hour week. The district court found it to be a fair inference from his testimony that Lash recognized the firm's obligation to pay a premium to any employee who was not exempt from the overtime provisions of the FLSA for any hours worked in excess of 40 per week. *Id.* at *2.

After a few weeks of shadowing Lash to become familiar with what he looked for in reviewing the reports prepared by associate appraisers, Urnikis-Negro began

to work without direct supervision. Much of her work was clerical in nature: she filed appraisal reports, answered the telephone, called mortgage brokers and lenders to solicit new business using a list supplied by Lash, and pursued outstanding balances owed on appraisals AFPS had completed. She also fielded calls from brokers and lenders inquiring about the status of pending appraisals, noting errors or deficiencies in reports that the firm had prepared, or in some instances rejecting an appraisal outright. In each instance, Urnikis-Negro would report the call to the appropriate appraiser. More substantively, Urnikis-Negro reviewed draft reports prepared either by the firm's associate appraisers or by outside appraisers with whom the firm had contracted. Her job was to check the reports for any errors or inconsistencies and to ensure that they conformed to the requirements of the lender or broker who had ordered the appraisal. With respect to this aspect of her work, the district court found:

> Urnikis-Negro's work in this regard largely consisted of that of a glorified proofreader. Her responsibility in reviewing the appraisal reports was to make sure that all the necessary parts of the report form were filled in, the form did not contain facially apparent errors, and it did not have internal inconsistencies. In addition . . . on some occasions Urnikis-Negro was responsible for communicating to the appraiser deficiencies that had been noted by the mortgage lender. These duties, which took up the majority of the time Urnikis-Negro spent on the job, did not involve the exercise of discretion or judgment on her part. Rather,

Urnikis-Negro simply ensured that forms had been filled out correctly, completely, and without errors. Any discretion or judgment exercised in connection with the appraisal forms was exercised by the appraiser, who had ultimate responsibility (both practically and legally) for everything in the appraisal report.

*Id.* at *3. The court acknowledged that some of what Urnikis-Negro did with respect to the firm's appraisals involved more than mere proofreading. Beyond making sure that the reports were complete and accurate, she was responsible for identifying any problems that might emerge when a lender reviewed the report. But her obligation was limited to identifying such potential problems and communicating them to the appraiser. *Id.* Similarly, although Urnikis-Negro occasionally suggested potential comparable properties that an appraiser might use to establish the value of the property being appraised, it was not her responsibility to make these suggestions and it was the appraiser who decided whether to accept her suggestion and to determine what comparable properties to include in the report. *Id.* at *4.

In sum, neither AFPS nor Todd Lash hired Urnikis-Negro to exercise judgment or discretion in connection with appraisals or otherwise. Rather, Lash and the company expected her, with regard to appraisal reports, to perform only the essentially ministerial function of reviewing the completeness and internal consistency of draft appraisal reports, and to note for the appraiser areas in which Lash or the lender might question the report.

*Id.* Finally, all reports were reviewed and approved by a certified appraiser—usually Todd Lash, but in some instances another individual. Urnikis-Negro was given the authority to affix the electronic signature of the certified appraiser once the appraiser approved the report. But she was only exercising the appraiser's authority in performing this task.

Given the large volume of business that the firm was handling in 2004 and 2005, Urnikis-Negro's work hours substantially exceeded 40 per week. Unfortunately, the parties kept no records of her actual hours, so "[t]he [c]ourt [was] left to determine by inference and circumstantial evidence how many overtime hours Urnikis-Negro worked." *Id.* at *10.[2] After weighing the conflicting testimony of the parties' witnesses on this point—much of which the court deemed incredible—the district court found by a preponderance of the evidence that Urnikis-Negro worked, on average, 12 hours per day, five days per week from the time her employment began in July 2004 through the end of June 2005, and 10 hours per weekday from July 2005 through December 2005, when the company's business slowed. *Id.* at *11. The court found further that Urnikis-Negro typically worked an additional six and one-half hours every other weekend throughout the period of her employment with AFPS. *Id.*

_____

[2] Reasonable approximations of this sort are appropriate. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88, 66 S. Ct. 1187, 1192 (1946), *superseded on other grounds by statute as stated in IBP, Inc. v. Alvarez*, 546 U.S. 21, 41, 126 S. Ct. 514, 527 (2005); *Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 595 (7th Cir. 2008); *Wirtz v. Turner*, 330 F.2d 11, 13 (7th Cir. 1964).

Those findings led the court to conclude that Urnikis-Negro worked a total of 1,490.5 hours of overtime over the course of her employment with AFPS. Specifically: (1) for the 24 weeks in the period from July 2004 through June 2005 when Urnikis-Negro worked an extra 6.5 hours over the weekend, she worked a total of 66.5 hours per week, which meant that she worked 26.5 hours of overtime per week, for a total of 636 overtime hours; (2) for the remaining 25 weeks in that same period, when she did not work over the weekend, Urnikis-Negro worked a total of 60 hours per week, meaning that she worked 20 hours of overtime per week, for a total of 500 hours of overtime; (3) for 14 weeks during the period from July 2005 through December 2005, as her time began to drop off, Urnikis-Negro worked 50 hours per week, with no weekend work, meaning that she worked 10 hours of overtime per week for a total of 140 hours of overtime; and (4) for the remaining 13 weeks in that same time period, when Urnikis-Negro worked another 6.5 hours over the weekend, for a total of 56.5 hours per week, with 16.5 hours of that sum being overtime work, for a total of 214.5 overtime hours. *See id.* at \*11, \*12. However, Urnikis-Negro was never paid anything over and above her regular weekly salary for these overtime hours. (For her part, Urnikis-Negro never asked for overtime pay while she was in AFPS's employ; her desire was to work fewer hours rather than to make more money. She testified that she made that known to multiple individuals at AFPS, but her complaints fell on deaf ears.)

Urnikis-Negro left the employ of AFPS in late December 2005, when she was terminated. By that time, the

volume of the firm's business had shrunk considerably (Todd Lash had had his license suspended indefinitely by the Illinois Department of Financial and Professional Regulation in May 2005) and the firm could no longer afford her services. She found a new position with a bank.

Urnikis-Negro subsequently filed suit against AFPS and the Lashes seeking unpaid overtime compensation pursuant to the FLSA, *see* 29 U.S.C. § 216(b), and the Illinois Minimum Wage Law, 820 ILCS 105/1, *et seq.*, along with payment for unused vacation time pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* The court would later find in favor of the defendants on the claim for vacation pay, and that finding is not contested on appeal. As to the claims for overtime pay, the defendants contended that they owed no such additional pay to Urnikis-Negro on the premise that she was "employed in a bona fide . . . administrative . . . capacity" as defined by the Secretary of Labor and was therefore exempt from the overtime provisions of the FLSA and the state statute. 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.202; 820 ILCS 105/4a(2)(E).

In view of the evidence presented at trial, the district court found that AFPS had failed to prove that it employed Urnikis-Negro in a bona fide administrative capacity. The pertinent regulation specifies that in order for a worker to be deemed employed in a bona fide administrative capacity, the performance of her primary duty must demand the exercise of discretion and independent judgment on matters of significance. 29 C.F.R.

§§ 541.200(a)(3), 541.202(a). But Urnikis-Negro did not exercise discretion and independent judgment in the performance of her primary duty with AFPS: "[She] neither made decisions about the firm's appraisals (or otherwise) and did not have authority to do so. Rather, she essentially proofread or checked the work of others and pointed out possible errors or omissions." 2008 WL 5539823, at *8. To the extent she made suggestions to appraisers about possible comparable properties, these were nothing more than suggestions; the appraisers themselves had sole control over the contents of their reports. *Id.* Thus, although her work related to a core function of the firm and may have had a substantial effect on its business, her role was not "administrative" in the sense defined by the Secretary of Labor. *Id.* She was therefore not exempt from the FLSA's overtime compensation mandate and was entitled to pay over and above her weekly salary for the overtime hours she worked while in AFPS's employ. *Id.* at *9. The court found further that the defendants in failing to pay Urnikis-Negro overtime had acted in reckless disregard of their obligations and her rights under the FLSA, a finding of willfulness which enabled her to recover unpaid overtime for up to three years in advance of the date she filed suit—enough to cover the entire period of her employment with AFPS. *Id.*; *see* 29 U.S.C. § 255(a).

The FLSA entitles covered employees to overtime compensation at one and one-half times their regular hourly pay for any hours in excess of 40 per week. § 207(a)(1); 29 C.F.R. § 778.107. On the premise that her weekly salary of $1,000 was meant to compensate her

solely for 40 hours of work, Urnikis-Negro contended that her regular hourly wage was $25.00, and that she was therefore entitled to overtime compensation at the rate of $37.50 per hour. However, because the court found that Urnikis-Negro understood at the time of her hiring that her fixed salary was intended to cover *all* of the hours she worked, even if they exceeded 40 hours per week, the court instead turned to section 778.114(a) and the FWW method set forth therein to calculate her regular hourly rate and overtime premium. As we discuss in greater detail below, section 778.114(a) recognizes the ability of an employer and an employee whose weekly hours fluctuate to agree that a fixed salary amount will serve as the employee's regular rate of compensation or "straight-time" pay (i.e., apart from overtime premiums) for any and all hours the employee works in a given week, regardless of their number. The employee's regular hourly wage will thus vary from week to week, rising and falling depending on the number of hours she works in a given week (with the statutory minimum wage constituting a floor). For any week in which the employee works more than 40 hours, the employer will still owe the employee an overtime premium. But because the fixed salary is meant to cover the regular rate of pay for *all* hours worked, the employer will owe the employee only half of the regular rate for any hours in excess of 40, rather than time *plus* one-half, since by agreement she has already been paid her regular rate for the overtime hours. *See* § 778.114(a).

   Urnikis-Negro had argued in advance of trial that it would be inappropriate to rely on the FWW method

in calculating her damages when AFPS had miscate-gorized her as exempt from the overtime requirements of the FLSA and had never contemporaneously paid her any overtime premiums when she worked more than 40 hours in a given week. R. 66, 67. The district court rejected her arguments in this regard, R. 71; 2008 WL 5539823, at *11, taking its cue from several circuits which have, largely on the authority of section 778.114(a), applied the FWW method in cases where the employers have erroneously treated the plaintiffs as exempt from the statute's overtime requirements. The court found it suffi-cient that "there was a 'clear mutual understanding between Urnikis-Negro and Todd Lash that her fixed salary of $1,000 per week or $52,000 per year was to serve as her compensation, apart from overtime premiums, for whatever number of hours she worked each week, rather than for working 40 hours or some other fixed period." 2008 WL 5539823, at *12 (citing *Valerio v. Putnam Assocs.*, 173 F.3d 35, 39-40 (1st Cir. 1999)).

The court thus proceeded to calculate the damages to which Urnikis-Negro was entitled on the assumption that her fixed salary had already compensated her at her regular rate of pay for all of the hours she worked. Al-though Urnikis-Negro did not work a set schedule and her hours varied from one week to the next, because there were no contemporaneous records of the hours that Urnikis-Negro had worked, the court could not calculate a regular hourly rate on a week-to-week basis. Instead, the court calculated a regular hourly rate for each of the four periods discussed above by dividing her weekly salary of $1,000 by the average number of hours per week

she worked in those periods, arriving at hourly rates of: (1) $15.00 per hour for the 24 weeks in the period from July 2004 through June 2005 when she worked 66.5 hours per week; (2) $16.66 per hour for the 25 weeks in that same period when she worked 60 hours per week; (3) $20.00 per hour for the 14 weeks in the period from July 2005 through December 2005 when she worked 50 hours per week; and (4) $17.70 per hour for the 13 weeks in that same period when she worked 56.5 hours per week. 2008 WL 5539823, at *12. The court then calculated the overtime pay due for each of these periods by halving the regular hourly rate and multiplying it by the number of overtime hours worked during that period. That calculation yielded unpaid overtime compensation of: (1) $4,770 for the 24 weeks in July 2004 through June 2005 when Urnikis-Negro worked 66.5 hours per week (.50 x $15/hour x 26.5 hours weekly overtime x 24 weeks); (2) $4,165 for the 25 weeks in the same period when she worked 60 hours per week (.50 x $16.66/hour x 20 hours weekly overtime x 25 weeks); (3) $1,400 for the 14 weeks in July 2005 through December 2005 when she worked 50 hours per week (.50 x $20/hour x 10 hours weekly overtime x 14 weeks); and (4) $1,898 for the 13 weeks in the same period when she worked 56.5 hours per week (.50 x $17.70/hour x 16.5 hours weekly overtime x 13 weeks). *Id.* The total amount of overtime compensation due to Urnikis-Negro thus came to $12,233. *Id.*

The court went on to find that Urnikis-Negro was entitled to liquidated damages in an equal amount. *See* 29 U.S.C. § 216(b). As the court noted, liquidated damages are presumptively appropriate for FLSA violations,

2008 WL 5539823, at *12 (citing *Bankston v. Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995)), and the court saw nothing in the evidence overcoming that presumption. "There is no indication that the defendants acted reasonably or in good faith in failing to pay overtime wages; rather, the defendants recklessly disregarded their obligations under this statute, just as they sought to flout their obligations under the income tax withholding and Social Security laws." *Id.* The court therefore awarded Urnikis-Negro total damages of $24,466 on Count One of her complaint, which set forth her FLSA claim. *Id.* The court entered an identical, cumulative amount on Count Two of her complaint, which set forth her state-law claim for overtime.[3] It also found that Urnikis-Negro was entitled to her attorney's fees and costs, *see* 29 U.S.C. § 216(b), which it later determined to be $95,130.71. R. 128; *Urnikis-Negro v. Am. Family Prop. Servs., Inc.*, No. 06 C 6014, 2009 WL 212122 (N.D. Ill. Jan. 26, 2009).

The district court's decision to apply the FWW method substantially reduced the damages awarded to Urnikis-Negro in two ways. First, by dividing her weekly salary by the total number of hours she worked in a week rather than by 40, the FWW method reduced the hourly wage constituting her regular rate of pay. Second, by

---

[3] The overtime provision of the Illinois Minimum Wage Law, 820 ILCS 105/4a(1), is parallel to that of the FLSA, and Illinois courts apply the same principles, including the FWW formula, to the state provision. *See Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993); *Haynes v. Tru-Green Corp.*, 507 N.E.2d 945, 951 (Ill. App. Ct. 1987).

presuming that the fixed weekly wage paid to Urnikis-Negro was meant to constitute payment at the regular rate for all of the hours she worked, including overtime, it reduced the overtime pay she was owed from 150 percent of the regular rate to just 50 percent of her regular rate. Had her weekly salary been deemed to cover a standard 40-hour workweek instead of any and all hours worked in a given week, her regular rate of pay, as mentioned, would have been $25 per hour and she would have received one and one-half times that rate, or $37.50 per hour, for all hours over 40 per week. Urnikis-Negro's total pay for the 1,490.5 overtime hours she worked would have been $55,893.75, and an award of an equal sum as liquidated damages would have brought her total damages to $111,787.50—more than four times what she actually received. Put another way, use of the FWW method reduced her total recovery by more than 75 percent.

## II.

Section 7(a)(1) of the FLSA sets the maximum regular workweek at 40 hours and entitles a nonexempt employee to overtime pay for any hours beyond that number: "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the *regular rate* at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis supplied). The employee's "regular rate" of pay is thus the "keystone" of

section 7(a). *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424, 65 S. Ct. 1242, 1244 (1945). "On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes. The proper determination of that rate is therefore of prime importance." *Id.* at 424, 65 S. Ct. at 1244-45.

For purposes of the overtime calculation, an employee's regular rate of pay is the amount of compensation he receives per hour. 29 C.F.R. § 778.109; *see Overnight Motor Transp. Co. v. Missel*, *supra*, 316 U.S. at 579-80, 62 S. Ct. at 1221. This does not mean that employers are compelled to pay their employees by the hour; "[i]t was not the purpose of Congress in enacting the Fair Labor Standards Act to impose upon the almost infinite variety of employment situations a single, rigid form of wage agreement." *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 203-04, 67 S. Ct. 1178, 1181 (1947) (citing *Walling v. A.H. Belo Corp.*, 316 U.S. 624, 62 S. Ct. 1223 (1942), *superseded on other grounds by statute as stated in Condo v. Sysco Corp.*, *supra*, 1 F.3d at 603 n.5), *judgment modified on other grounds*, 331 U.S. 795, 67 S. Ct. 1726 (1947). Thus, although the regular rate of pay is expressed in terms of an hourly wage, employees may, in practice, be paid in a variety of other ways: "their earnings may be determined on a piece-rate, salary, commission or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek . . . ." § 778.109; *see Missel*, 316 U.S. at 580, 62 S. Ct. at 1221.

Urnikis-Negro was a salaried employee. The computation of her regular rate of pay thus begins with the determination of her weekly salary. *See* 29 U.S.C. § 778.113. As the Supreme Court explained in *Missel*, "It is . . . abundantly clear from the words of section 7 that the unit of time under that section within which to distinguish regular from overtime is the week[:] 'No employer shall * * * employ any of his employees * * * (1) for a workweek longer tha[n] forty-four hours * * *.'" 316 U.S. at 579, 62 S. Ct. at 1221 (citation omitted).[4] Urnikis-Negro was hired at an annual salary of $52,000; dividing that salary by fifty-two (the number of weeks in a year) yields a weekly salary of $1,000. *See* § 778.113(b). To produce the regular hourly rate of pay for purposes of the overtime calculation, the weekly salary must in turn be divided "by the number of hours which the salary is intended to compensate." § 778.113(a).

Ascertainment of the regular hourly rate of pay would be a straightforward calculation had Urnikis-Negro been hired to work a set number of hours per week. To take the easiest example, had she routinely worked from 9:00 a.m. to 5:00 p.m. five days a week, determining her regular rate of pay would be a simple matter of dividing her weekly salary of $1,000 by the 40 hours that salary was meant to compensate, yielding an hourly salary of $25.00. *See* § 778.113(a). Any hours she worked in excess

---

[4] As originally enacted, section 7(a) of the FLSA set the maximum regular workweek at 44 hours for the first year following the statute's effective date, 42 hours for the following year, and 40 hours thereafter. *See* 52 Stat. 1060, 1063 (June 25, 1938).

of 40 would then be compensated at one and one-half times that hourly rate, or $37.50. *See id.*

But Urnikis-Negro was not hired to work a fixed number of hours per week. Although the district court found it likely that Urnikis-Negro when hired *believed* she would be working a 40-hour week, as she had for the bank, in fact she routinely worked many hours in excess of 40 per week throughout the period of her employment with AFPS; and the court found further that her salary was intended to compensate her for whatever hours she happened to work. Thus, although her weekly pay was fixed, her weekly hours were indeterminate and routinely exceeded the standard workweek of 40 hours. In view of the Supreme Court's decision in *Missel*, this arrangement has an impact on both the calculation of her regular rate of pay and the amount of overtime pay to which she is entitled.

The Court in *Missel* held that when an employee is, by agreement, paid a fixed weekly wage for hours that fluctuate from week to week, the proper way to calculate the employee's regular rate of pay is to divide the weekly wage by the number of hours actually worked in a particular week.

> No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates. Where the employment contract is for a weekly wage with variable or

fluctuating hours the same method of computation produces the regular rate for each week. As that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked. It is true that the longer the hours the less the rate and the pay per hour. This is not an argument, however, against this method of determining the regular of employment for the week in question. Apart from the Act if there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour. This method of computation has been approved by each circuit court of appeals which has considered such problems. See Warren-Bradshaw Drilling Co. v. Hall, 5 Cir., 124 F.2d 42, 44; Bumpus v. Continental Baking Co., 6 Cir., 124 F.2d 549, 552, cf. Carleton Screw Products Co. v. Fleming, 8 Cir., 126 F.2d 537, 541. It is this quotient which is the "regular rate at which an employee is employed" under contracts of the types described and applied in this paragraph for fixed weekly compensation for hours, certain or variable.

316 U.S. at 580, 62 S. Ct. at 1221 (footnotes omitted).

As they have some bearing on this case, a few additional details about *Missel* are worth summarizing. Missel worked as a rate clerk for a trucking company. In lieu of an hourly wage, Missel was paid a fixed weekly sum for hours that fluctuated widely from day to day but averaged (during the period for which records were

available) 65 hours per week and in some weeks totaled as many as 75 or 80 hours. Despite the long hours, his employer never paid him anything additional for his overtime, on the theory that Missel's weekly compensation was sufficient to pay him the statutory minimum wage (which was 25 cents an hour during the first effective year of the FLSA, *see* 52 Stat. 1060, 1062 (June 25, 1938)) plus one and one-half times that rate for all of the overtime hours he actually worked. Effectively, the employer was asserting that Missel's regular rate of pay, by default, was the statutory minimum wage. The district court adopted that same theory in rejecting Missel's suit for overtime pay. 40 F. Supp. 174, 180 (D. Md. 1941). But the Supreme Court rejected that rationale, pointing out that there was nothing in the (unwritten) agreement between Missel and his employer limiting the number of hours he could be made to work and no provision to pay him more in the event he worked so many hours that the weekly wage proved insufficient to compensate him even at the statutory minimum wage (plus one and one-half times that wage for overtime). 316 U.S. at 581, 62 S. Ct. at 1222. The Court was thus unwilling to presume that Missel's regular rate of pay was equal to the statutory minimum wage simply because, in hindsight, using that rate meant that Missel had already received both the regular and overtime pay to which he was entitled. "Implication cannot mend a contract so deficient in complying with the law." *Ibid.* Instead, in the absence of any contractual provision for overtime, the court presumed that Missel's fixed weekly wage was meant to compensate him only at the regular rate for the hours

that he worked, exclusive of any overtime premium. *Id.* at 580, 62 S. Ct. at 1221. Taking this approach meant that Missel's regular rate of pay would be higher than the minimum wage and that his employer would owe him additional pay (and at a higher rate) for the many overtime hours he had worked. That result was consistent with what the Court cited as one of the purposes of the FLSA, which was to exert pressure on employers to shorten the workweek and spread work among a greater number of employees by requiring employers to pay a premium for overtime work. *Id.* at 577-78, 62 S. Ct. at 1220.

Notably, the approach taken by the Court in *Missel* treats the fixed weekly wage paid to the employee as compensation at the regular rate for *all* hours that the employee works in a week, including overtime hours. The employer will separately owe the employee a premium for the overtime hours, but because he has already been compensated at the regular rate for the overtime hours by means of the fixed wage, the employer will owe him only one-half of the regular rate for those hours rather than time *plus* one-half. As *Missel* itself also recognizes, the employee's regular rate of pay will vary depending on the number of hours he works in a given week; the greater the number of hours he works, the lesser will be his regular, hourly rate of pay. And the overtime premium that the employer owes his employee for any hours worked above 40 will rise or fall along with the total number of hours worked in a week and the resulting regular rate of pay.

*Missel*'s method of determining the regular rate of pay for an employee whose work hours fluctuate but who is paid a fixed salary for whatever hours he works has since been incorporated into an interpretive rule promulgated by the Department of Labor. *See* 29 C.F.R. § 778.114. It is among a number of rules comprising a broader interpretive bulletin issued in 1968 that memorializes the Department of Labor's understanding of the meaning and application of the maximum hours and overtime pay requirements of the FLSA. 33 Fed. Reg. 986 (Jan. 23, 1968); *see* 29 U.S.C. § 778.1 The bulletin was not issued pursuant to the usual notice and rulemaking procedures used with formal regulations. 33 Fed. Reg. 986; *see Mayhew v. Wells*, 125 F.3d 216, 218 (4th Cir. 1997); *Desmond v. PNGI Charles Town Gaming, LLC*, 661 F. Supp. 2d 573, 579 n.2 (N.D. W. Va. 2009); *In re Texas EZPawn Fair Labor Standards Act Litigation*, 633 F. Supp. 2d 395, 399, 402 (W.D. Tex. 2008). However, as the bulletin reflects the DOL's official understanding of the FLSA's requirements, it is nonetheless entitled to a "measure of respect" from the judiciary. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 390, 128 S. Ct. 1147, 1156 (2008) (quoting *Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461, 488, 124 S. Ct. 983, 1001 (2004)); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140, 65 S. Ct. 161, 164 (1944); *Missel*, 316 U.S. at 580 n.17, 62 S. Ct. at 1221-22 n.17; *see U.S. Freightways Corp. v. C.I.R.*, 270 F.3d 1137, 1141 (7th Cir. 2001) (courts give full deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), only to those regulations issued with full notice and opportu-

nity for comment or like formalities; more informal state-
ments of position "receive a more flexible respect").
We have specifically sustained section 778.114 as a rea-
sonable construction of the FLSA's overtime require-
ments. *Condo*, 1 F.3d at 605. And as our discussion will
make clear, our reservation is not with the Department of
Labor's interpretive rule, but rather with judicial ap-
plication of that rule to misclassification cases in which
the rule's prerequisites are not met.

Section 778.114 explains how and under what circum-
stances an employer may compensate an employee
using the FWW method:

> (a) An employee employed on a salary basis may
> have hours of work which fluctuate from week to week
> and the salary may be paid [to] him pursuant to an
> understanding with his employer that he will receive
> such fixed amount as straight time pay for whatever
> hours he is called upon to work in a workweek,
> whether few or many. Where there is a clear mutual
> understanding of the parties that the fixed salary is
> compensation (apart from overtime premiums) for the
> hours worked each workweek, whatever their number,
> rather than for working 40 hours or some other fixed
> weekly work period, such a salary arrangement is
> permitted by the [FLSA] if the amount of the salary is
> sufficient to provide compensation to the employee
> at a rate not less than the applicable minimum wage
> rate for every hour worked in those workweeks in
> which the number of hours he works is greatest, and if
> he receives extra compensation, in addition to such

salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

(b) The application of the principles above stated may be illustrated by the case of an employee whose hours of work do not customarily follow a regular schedule but vary from week to week, whose overtime work is never in excess of 50 hours in a workweek, and whose salary of $250 a week is paid with the understanding that it constitutes his compensation, except for overtime premiums, for whatever hours are worked in the workweek. If during the course of 4 weeks this employee works 40, 44, 50, and 48 hours, his regular hourly rate of pay in each of these weeks is approximately $6.25, $5.68, $5, and $5.21, respectively. Since the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due. For the first week the employee is entitled to be

paid $250; for the second week $261.36 ($250 plus 4 hours at $2.84, or 40 hours at $5.68 plus 4 hours at $8.52); for the third week $275 ($250 plus 10 hours at $2.50, or 40 hours at $5 plus 10 hours at $7.50); for the fourth week approximately $270.88 ($250 plus 8 hours at $2.61 or 40 hours at $5.21 plus 8 hours at $7.82).

(c) The "fluctuating workweek" method of overtime payment may not be used unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under the Act, and unless the employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek and the employer pays the salary even though the workweek is one in which a full schedule of hours is not worked. Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones, under the circumstances of the employment as a whole. Where all the legal prerequisites for use of the "fluctuating workweek" method of overtime payment are present, the Act, in requiring that "not less than" the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more. On the other hand, where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours,

compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula.

§ 778.114.[5]

Several aspects of this interpretive rule bear mentioning. First, the rule is forward looking. It describes a manner in which an employer may compensate a non-exempt employee by means of a fixed wage for variable work hours and still comply with the overtime obligation imposed by the FLSA. Second, the rule requires both a "clear mutual understanding" between the em-

---

[5] Although section 778.114 in its current form dates to 1968, the Department of Labor's Wage & Hour Division has, since the earliest days of the FLSA, taken the position that when an employer and its employee have agreed that the employee will be paid a fixed salary for work hours that fluctuate from week to week, his regular rate of pay should be determined by dividing the fixed wage by the hours worked in a particular week, and the employee will be owed a premium of 50 percent of that rate for any overtime hours. *See* Interpretative Bulletin No. 4 ¶¶ 10, 12 (Oct. 21, 1938, as revised November 1940), 1941 Wage & Hour Man. (BNA) 127, 128-29. The Supreme Court noted as much in *Missel*, 316 U.S. at 580 n.17, 62 S. Ct. at 1221-22 n.17, adding that "[w]hile the interpretative bulletins are not issued as regulations under statutory authority, they do carry persuasiveness as an expression of the view of those experienced in the administration of the Act and acting with the advice of a staff specializing in its interpretation and application." *See also Walling v. A.H. Belo Corp.*, *supra*, 316 U.S. at 631 n.7, 62 S. Ct. at 1227 n.7.

ployer and employee that the fixed wage will constitute the employee's regular or straight-time pay for any and all hours worked in a given week *and* the separate payment of an overtime premium for any hours in excess of 40 that are worked in that week. § 778.114(a). Third, the rule on its face is not a remedial measure. It says nothing about how a court is to calculate damages where, as here, the employer has breached its obligation to pay the employee an overtime premium. Its focus instead is on how an employer may comply with its statutory obligations in the first instance and avoid liability for breach of those obligations.

Despite the nonremedial nature of the rule, a number of courts—both appellate and district—have relied on section 778.114(a) in fashioning relief for cases in which an employee receiving a fixed wage has been misclassified as exempt from the overtime mandate of the FLSA and thus has not received overtime pay. *See Clements v. Serco, Inc.*, 530 F.3d 1224, 1230-31 (10th Cir. 2008); *Valerio v. Putnam Assocs.*, *supra*, 173 F.3d at 39-40; *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138-39 (5th Cir. 1988); *see also*, *e.g.*, *Desmond v. PNGI Charles Town Gaming, LLC*, *supra*, 661 F. Supp. 2d at 578-85; *Torres v. Bacardi Global Brands Promotions, Inc.*, 482 F. Supp. 2d 1379, 1380-82 (S.D. Fla. 2007); *Perez v. RadioShack Corp.*, No. 02 C 7884, 11 Wage & Hour Cas. 2d (BNA) 163, 2005 WL 3750320, at *6-*8 (N.D. Ill. Dec. 14, 2005); *Tumulty v. FedEx Ground Package Sys., Inc.*, No. C04-1425P, 2005 WL 1979104, at *4-*5 (W.D. Va. Aug. 16, 2005); *Saizan v. Delta Concrete Prods. Co.*, 209 F. Supp. 2d 639, 640-41 (M.D. La. 2002); *Donihoo v. Dallas Airmotive, Inc.*, No. Civ. A. 3:97-CV-0109P, 1998 WL

47632, at *6 (N.D. Tex. Feb. 2, 1998). As the district court did here, these courts typically have relied on proof of a clear mutual understanding between the employer and the employee that the employee's fixed salary was meant to compensate him for any and all hours that the employee worked to place the case within the FWW framework. Although the employee, as a result of the misclassification, has never been paid an overtime premium, courts fill in that piece of the FWW formula by making the premium part of the damages award. The employee's regular rate of pay is determined by the total hours worked in a week into his fixed weekly wage, and he is awarded a premium of one-half of that rate for the overtime hours he worked in that week. *See, e.g., Clements*, 530 F.3d at 1230-31; *Valerio*, 173 F.3d at 39-40; *Blackmon*, 835 F.2d at 1138-39.

The fit between section 778.114(a) and the misclassified employee is an imperfect one, to be sure, for reasons we have already touched upon. Besides looking forward rather than backward, the interpretive rule plainly envisions the employee's contemporaneous receipt of a premium apart from his fixed wage for any overtime work he has performed. The rule expressly requires both "a clear mutual understanding [between] the parties that the fixed salary is compensation (*apart from overtime premiums*) for the hours worked each workweek, whatever their number" and that the employee "*receive*[ ] *extra compensation, in addition to such salary for all overtime hours worked at a rate not less than one-half his regular rate of pay.*" § 778.114(a) (emphasis ours). *See Condo*, 1 F.3d at 601; *see also* 29 C.F.R. § 778.106 ("The general rule is that overtime

compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends."); *see also Rainey v. Am. Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 100-01 (D.D.C. 1998) (coll. cases in which judicial use of FWW method deemed appropriate because overtime premium was paid contemporaneously to employee), *disagreed with on other grounds by A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001).[6] Plainly the employee has not received such extra compensation when, as was true in this case, her employer has misclassified her as exempt from the FLSA's overtime requirements and has never separately paid her for overtime. *See Monahan v. Emerald Performance Mat'ls, LLC*, — F. Supp. 2d —, 2010 WL 724031, at *9 (W.D. Wash. Feb. 25, 2010) (resolving state law claim with reference to federal law); *Russell v. Wells Fargo & Co.*, 672 F. Supp. 2d 1008, 1013-14 (N.D. Cal. 2009); *Brown v. Nipper Auto Parts & Supplies, Inc.*, No. Civ. A. 7:08CV00521, 156 Lab. Cas. ¶ 35,579, 2009 WL 1437836, at *7 (W.D. Va. May 21, 2009); *Texas EZPawn, supra*, 633 F. Supp. 2d at 401; *Scott v. OTS Inc.*, No. Civ. A. 1:02CV1950-AJB, 11 Wage &

---

[6] In 2008, the Department of Labor's Wage & Hour Division issued a notice of proposed rulemaking which, in relevant part, proposed to modify section 774.118(a) by deleting the phrase "apart from overtime premiums" from the language describing the clear mutual understanding between the employer and employee that the latter's salary will serve as compensation for whatever hours he works in a given week. 73 Fed. Reg. 43654, at 43669-70 (Jul. 28, 2008). The proposed modification was not adopted, however.

Hour Cas. 2d (BNA) 1714, 2006 WL 870369, at *13 (N.D. Ga. Mar. 31, 2006); *Cowan v. Treetop Enters., Inc.*, 163 F. Supp. 2d 930, 941 (M.D. Tenn. 2001); *Rainey*, 26 F. Supp. 2d at 100-01; *see also Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 59-60 (D.D.C. 2006); *Rushing v. Shelby County Gov't*, 8 F. Supp. 2d 737, 745 (W.D. Tenn. 1997). Subsection (c) of the rule reinforces this point, cautioning that "where all the facts indicate an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula." Section 778.114(a) is thus a dubious source of authority for calculating a misclassified employee's damages in the way that the district court did here. A number of district courts, noting that the rule's requirements invariably have not been satisfied in employee-misclassification cases, have thus rejected reliance on the rule in calculating an employee's regular rate of pay. *See Monahan*, 2010 WL 724031, at *7-*9; *Brown*, 2009 WL 1437836, at *6-*7; *Russell*, 672 F. Supp. 2d 1008; *Texas EZPawn*, 633 F. Supp. 2d at 400-06; *Scott*, 2006 WL 870369, at *11-*13; *Cowan*, 163 F. Supp. 2d at 940-42; *Rainey*, 26 F. Supp. 2d at 100-02. We find the reasoning of these cases to be persuasive.

But finding that section 778.114(a) itself is inapplicable does not compel the conclusion that reliance on the FWW method of calculating Urnikis-Negro's regular rate of pay was erroneous. Setting the Department of Labor's rule aside, a court still must ascertain the employee's regular rate of pay and calculate an appropriate overtime

premium based on that rate. Where the employee was paid a fixed weekly salary, this requires first determining the number of hours that salary was intended to compensate. A number of courts that have deemed section 778.114 inapplicable have reasoned that if the requirements of the rule are not met, one should presume that an employee's fixed weekly salary was meant to compensate him solely for 40 hours of work even when he regularly worked more than 40 hours without any expectation of additional pay. *E.g.*, *Monahan*, 2010 WL 724031, at *8; *Texas EZPawn*, 633 F. Supp. 2d at 397, 404-05; *Rainey*, 26 F. Supp. 2d at 85, 102. Employing that presumption would lead to the conclusion that the employee has received no pay at all for his overtime (i.e., neither straight-time pay nor an overtime premium) and is thus entitled to one and one-half his regular rate of pay for all overtime hours. It would also boost his regular rate of pay, as his fixed weekly wage would be divided by 40 rather than the (higher) total number of hours he worked during the week. *Texas EZPawn*, 633 F. Supp. 2d at 404.

Assuming without deciding that it might be appropriate to presume that a misclassified employee's fixed salary was meant to compensate him solely for 40 hours, the presumption cannot be irrebuttable. The employee's regular rate of pay is a factual matter, *Walling v. Youngerman-Reynolds Hardwood Co.*, *supra*, 325 U.S. at 424-25, 65 S. Ct. at 1245, and where the employer and the employee have in fact agreed that a fixed weekly salary will constitute payment at the regular rate for any and all hours worked—which *Missel* recognizes they are free to

do, *see* 316 U.S. at 580, 62 S. Ct. at 1221[7]—there is no factual basis for deeming the salary to constitute straight-time compensation for 40 hours alone. True, the employer in this scenario, and perhaps the employee as well, have failed to recognize the employee's entitlement to a premium for overtime hours. In that respect, the agreement runs afoul of the FLSA. But that breach of the statute does not alter the employee's regular rate of pay, which under *Missel* turns on what the parties agreed the employee would be paid for the hours he actually worked (so long as the rate is not lower than the minimum wage). The overtime premium can and will be awarded by the court retroactively. *See* Paul Decamp & Jacqueline C. Tully, *Half-Time or Time and A-Half? Calculating Overtime in Misclassification Cases*, 278 Fair Lab. Stds. Handbook for States, Local Gov't & Sch. Newsl. 3 (Nov. 2008) (proper focus in calculating regular rate of pay for misclassified employee is on whether parties intended fixed salary to compensate employee for all hours worked in work-week or solely for first 40 hours).

The evidence in this case was mixed as to the number of hours Urnikis-Negro's fixed weekly salary was meant to compensate. Urnikis-Negro testified that she expected,

---

[7] *See also Walling*, 325 U.S. at 424, 65 S. Ct. at 1245 ("As long as the minimum hourly rates established by Section 6 are respected, the employer and employee are free to establish th[e] regular rate at any point and in any manner they see fit. They may agree to pay compensation according to any time or work measurement they desire.").

at the time of her hiring, to be working 40 hours per
week and that Lash had offered her the job at $1,000 per
week for hours similar to those she had been working at
the bank, which amounted to 40 per week. R. 97 at 35, 53,
64. Lash himself testified that all AFPS employees were
paid based on a 40-hour week. R. 98 at 80 (quoting R. 42-5
at 30). Yet, it is undisputed that Urnikis-Negro routinely
worked substantially more than 40 hours per week
throughout her tenure with AFPS and was never paid
anything apart from her fixed weekly wage of $1,000. In
weighing the evidence, the district court found that
although Urnikis-Negro likely thought she would be
working 40-hour weeks, "her understanding was that her
salary was to cover whatever time she was called upon to
work in a given week." 2008 WL 5539823, at *2. The court
found further that it was "less than crystal clear what
[Lash] meant" when he said that all salaries at AFPS
were based on a 40-hour week; in the court's view, it was
a fair inference that Lash was simply acknowledging
the company's obligation to pay overtime to any em-
ployees who worked more than 40 hours and were not
exempt from the statute's overtime requirement. *Id.*
Ultimately, the court determined that Urnikis-Negro
and the defendants had a "clear mutual understanding"
that her weekly salary of $1,000 was meant to compen-
sate her for however many hours she worked, not 40 or
some other number. *Id.* at *12. This was a finding of fact
and it was not clearly erroneous. It is true that the court
made this finding in the context of applying section
778.114(a), which as we have discussed is not a remedial
rule and thus does not supply the proper analytical

framework for a determination of damages once an employer has been found to have breached its obligation to pay overtime under the FLSA. Nonetheless, the court's finding addresses the very question that is the starting point for determining Urnikis-Negro's regular rate of pay: For what number of hours was her fixed weekly wage intended to compensate her? The court here unequivocally determined that Urnikis-Negro's wage was intended to compensate her not for 40 hours per week or some other fixed number of hours, but for any and *all* hours that she worked in a given week.[8]

Given this finding, it is *Missel* which dictates how the regular rate of pay must be calculated here. *See Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1324 (1st Cir. 1992) ("[*Missel*'s] outcome is binding on us and the district judge . . . ."); *Rushing v. Shelby County Gov't*, *supra*, 8 F. Supp. 2d at 745 ("[t]his is not a proper case for application of the fluctuating workweek provision [section 778.114,]" as the parties' agreement did not include understanding

---

[8]  We note that the agreement that an employee is to be paid a fixed salary for whatever hours she worked need not be evidenced in writing. *Griffin v. Wake County*, 142 F.3d 712, 716 (4th Cir. 1998) (citing *Bailey v. County of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996)). The existence of such an agreement instead may be inferred from the parties' conduct. *See Mayhew v. Wells*, *supra*, 125 F.3d at 219 (citing *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1281 n.21 (4th Cir. 1996)); *see also, e.g.*, *Clements v. Serco, Inc.*, *supra*, 530 F.3d at 1231; *Valerio v. Putnam Assocs.*, *supra*, 173 F.3d at 39-40.

that plaintiffs were entitled to overtime pay; calculation of overtime premium was instead governed by *Missel*); *Zoltek v. Safelite Glass Corp.*, 884 F. Supp. 283, 287 (N.D. Ill. 1995) ("Because the parties agreed that Zoltek was to be compensated on a salaried basis, with no additional payment for overtime hours, the calculation of his 'regular rate' is governed by the formula described in [*Missel*]."). Urnikis-Negro, like Missel, was paid a fixed weekly sum for any and all hours that she worked. Like Missel, she routinely worked substantial amounts of overtime. And like Missel, she never received any premium for the overtime hours she worked. The Supreme Court held that in this situation, the employee's regular rate of pay for a given week is calculated by dividing the fixed weekly wage by the total number of hours worked in that week. 316 U.S. at 580, 62 S. Ct. at 1221. The employee is then entitled to an overtime premium of one-half of that rate. *See ibid.* & n.16; *Walling*, 316 U.S. at 634, 62 S. Ct. at 1228 (discussing calculation of regular and overtime rates of pay under *Missel*). As we have noted, this method of calculating an employee's regular rate of pay and the overtime premium has been incorporated into section 778.114, which is why the result of applying that rule is correct even if, analytically, the rule itself is inapt. Indeed, the approach pre-dates the Supreme Court's decision in *Missel*, which noted that it already had been adopted by every circuit court of appeals to address the subject. 316 U.S. at 580, 62 S. Ct. at 1221 (coll. cases); *see Warren-Bradshaw Drilling Co. v. Hall*, 124 F.2d 42, 44 (5th Cir. 1941) (cited in *Missel*) ("What the statute in effect provides, and what this court has held, is: That overtime

must be compensated for at one and one-half times the regular rate at which the wage earner is employed; that that rate may be fixed by agreement; and that if there is no agreement fixing the amount to be paid for regular and overtime work, the regular rate, as to it, may properly be determined by dividing the total pay each week by the total hours worked."), *judgment aff'd*, 317 U.S. 88, 63 S. Ct. 125 (1942); *Bumpus v. Continental Baking Co.*, 124 F.2d 549, 553 (6th Cir. 1941) (cited in *Missel*) (calculating employee's regular rate by dividing fixed weekly wage by the 48 hours per week it was intended to compensate, and further holding that "[f]or each overtime hour for which appellant received his regular rate he is entitled only to additional half-time pay"), *cert. denied*, 316 U.S. 704, 62 S. Ct. 1305 (1942); *see also Missel v. Overnight Motor Transp. Co.*, 126 F.2d 98, 110 (4th Cir. 1942) (coll. district court and state cases applying same approach), *judgment aff'd*, 316 U.S. 572, 62 S. Ct. 1216.

Indeed, it is worth noting that in *Missel*, the Fourth Circuit explicitly rejected the use of the statutory maximum workweek as the basis for calculating the employer's regular rate of pay. The plaintiff had suggested using the statutory maximum (then 42 or 44 hours per week) as a divisor instead of the total hours worked in a week. 126 F.2d at 101. But the court found "[n]o authority" for that method of calculating his regular rate of compensation and rejected it on that basis. *Id.* at 102 n.3. And the Supreme Court, as we have discussed, held that it was appropriate to divide the plaintiff's fixed weekly wage by the total hours worked rather than by

some other number. *See Martin*, 969 F.2d at 1324; *Rushing*, 8 F. Supp. 2d at 745; *Zoltek*, 884 F. Supp. at 287-88.[9]

---

[9]  As we have noted, the Wage & Hour Division of the Department of Labor itself took the same approach to determining an employee's regular rate of pay prior to the Supreme Court's decision in *Missel*. *See* n.5, *supra*. In recent years, the Division has also issued two opinion letters supporting the retroactive payment of overtime pursuant to the FWW formula. A 1996 letter answered "yes" to the question whether the Division's coefficient table for calculating overtime premiums of 50 percent could be used to retroactively determine the amount of overtime due to an employee who was never paid overtime in the first instance. Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter—FLSA, 1996 WL 1005216 (July 15, 1996). But because the letter reveals little about the circumstances underlying the inquiry and the Division's reasons for answering in the affirmative, it carries little if any persuasive weight. *See Hunter*, 453 F. Supp. 2d at 59-60 n.18. More recently, in a much more detailed letter, the Division agreed that an employer could properly use the FWW method to retroactively calculate the overtime owed to a salaried employee who regularly worked in excess of 40 hours per week, but whom the employer only belatedly realized was not exempt from the overtime mandate of the FLSA. *See* Wage & Hour Div., U.S. Dep't of Labor, *Retroactive payment of overtime and the fluctuating workweek method of payment*, Opinion Letter FLSA 2009-3 (Jan. 14, 2009). Citing the Tenth Circuit's decision in *Clements* and the First Circuit's decision in *Valerio*, the letter found it sufficient that the parties had a clear mutual understanding that the fixed salary was meant to compensate the employee for whatever number of hours he worked in a week. The detail of this

(continued...)

As Urnikis-Negro points out, there are ways in which calculating her regular rate of pay in this manner works to the defendants' benefit. As we noted in summarizing the district court's holding, dividing Urnikis-Negro's weekly salary by the total hours she worked in a week, rather than by 40, results in a significantly lower hourly rate, as Urnikis-Negro routinely worked substantially more than 40 hours per week. And by treating her overtime hours as already having been compensated at the regular rate of pay, such that she is owed only the 50-percent overtime premium, this method substantially reduces the amount of overtime pay to which she is now entitled. Consider the following table reflecting the calculation of the regular rate of pay and the corresponding overtime premium using the FWW method for an employee who, like Urnikis-Negro, is paid a fixed salary of $1,000 per week:

---

[9] (...continued)
second letter imbues it with somewhat more persuasive force than the first, but it adds nothing beyond the points that the courts analyzing this issue have already made.

**Calculation of Overtime Using FWW Method**

| Weekly Hours | Regular Rate[10] | O/T Premium | O/T Hours | Total Pay |
|---|---|---|---|---|
| 40 hours | $25.00/ hour | $12.50/ hour | 0 | $1,000 |
| 50 hours | $20.00/ hour | $10.00/ hour | 10 | $1,100 |
| 60 hours | $16.67/ hour | $8.33/ hour | 20 | $1,166 |
| 80 hours | $12.50/ hour | $6.25/ hour | 40 | $1,250 |
| 100 hours | $10.00/ hour | $5.00/ hour | 60 | $1,300 |

What the table makes clear is that the employee's hourly rate of pay is inversely proportional to how hard she works. For a workweek equaling the statutory maximum of 40 hours, the employer is compensated at the rate of $25.00 per hour. For a workweek twice that long, her regular hourly rate is one-half that much—$12.50 per hour—and her overtime premium is likewise one-half of what it would be based on a 40-hour workweek. In effect, comparing the two rates of pay, the em-

---

[10] We note that the each of the regular rates of pay set forth in this table is above the federal minimum wage, which currently is $7.25 per hour.

ployee who works an 80-hour week is not receiving time and a-half for her overtime hours, but half-time ($18.75 total compensation per overtime hour versus $37.50).

At the same time, because the employer is made to pay the misclassified employee an overtime premium no greater than it would have paid had it complied with section 778.114(a) in the first instance, the employer receives the benefit of the rule without having ever paid the employee contemporaneously for her overtime work. By contrast, calculating the worker's regular rate of pay on the basis of a 40-hour week rather than the FWW method would boost the worker's damages and penalize the employer more severely for having misclassified her. Urnikis-Negro argues that use of the more employer-friendly FWW method gives employers an incentive to misclassify employees as exempt from the FLSA's overtime requirements or otherwise withhold overtime pay, as they will be little the worse off if and when sued to enforce the statute's requirements.

We would add that cases like this one, where the employee has routinely worked more than a 40-hour week, do not truly fit the fluctuating workweek paradigm, in that the employee's hours rarely if ever drop below 40. *See* § 778.114(c) ("Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long work-weeks *as well as short ones*, under the circumstances of the employment as a whole.") (emphasis ours); *Heder v.*

*City of Two Rivers, Wis.*, 295 F.3d 777, 779-80 (7th Cir. 2002). Use of the FWW method in these cases makes it look more like a way to simply reduce the employee's compensation rather than to compensate for fluctuations above *and* below the standard 40-hour week. And rather than giving employers an incentive to reduce employees' working hours and to spread available work among greater numbers of employees, as the statutory over-time pay requirement was meant to do, *see Walling v. Youngerman-Reynolds Hardwood Co., supra*, 325 U.S. at 423-24, 65 S. Ct. at 1244; *Missel*, 316 U.S. at 577-78, 62 S. Ct. at 1220, the FWW method would seem to give them exactly the opposite incentive, for as the workweek lengthens, the employer is paying her less per hour in straight-time pay and owes her a correspondingly smaller overtime premium for each hour of work over 40. In short, the hourly cost of labor using the FWW method decreases the longer the employee is required to work.

There are answers to these criticisms. First, the Supreme Court in *Missel* was well aware of the ways in which the FWW method of calculating straight-time pay and over-time pay reduced the amounts owed to the employee for hours worked in excess of the standard workweek. It adopted that method nonetheless. 316 U.S. at 580, 62 S. Ct. at 1221. Second, even if the 50-percent overtime premium that Urnikis-Negro achieves by way of a law-suit is no more than the defendants would (and should) have paid her in the first instance in complying with section 778.114(a), that is not the sole relief to which she is entitled. The district court awarded her liquidated damages equal in amount to the award of the overtime

premium based on the finding that the defendants' violation of the FLSA was wilful, and it also awarded Urnikis-Negro her attorney's fees and costs. So the defendants are in some real sense suffering the consequences of not complying with their legal obligations in the first instance. Finally, the pattern of working excess hours appears also to have been present in *Missel*, where the plaintiff worked an average workweek of 65 hours (more than 20 hours over the applicable maximum), 316 U.S. at 574, 62 S. Ct. at 1218, and yet the Court had no hesitation in embracing the FWW method of calculating his regular hourly rate of pay. It was enough, in the Court's view, that Missel's hours varied, despite the evident possibility that they fluctuated only *above* the statutory maximum rather than below it. More to the point, we found it proper to apply section 778.114 in *Condo v. Sysco Corp.* despite our acknowledgment that the plaintiff never worked less than 40 hours per week. 1 F.3d at 602-03. *See also* § 778.114(b) (setting forth example in which employee's hours in each of four workweeks meet or exceed 40).

It is not within our province to pass on the merits of these competing arguments. Our job is to apply the statute as Congress has written it and as the Supreme Court and the Department of Labor have interpreted it. Any argument to the effect that the fluctuating workweek method of calculating one's regular rate of pay and overtime premium is insufficiently compensatory to the plaintiff and insufficiently deterring to the employer that is inclined to neglect its obligations under the FLSA is an argument better addressed to Congress and the Secretary of Labor.

### III.

The district court correctly calculated Urnikis-Negro's regular rate of pay and the premium to which she was entitled for the overtime hours she worked while in the defendants' employ. We therefore AFFIRM the district court's judgment. We thank Urnikis-Negro and her counsel for the excellent briefing on the issue presented.